# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71738-3-I |
| Respondent, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| | ) | UNPUBLISHED OPINION |
| DERRICK LAMONT THOMAS, | ) ) | |
| Appellant. | ) | FILED: July 7, 2014 |
| | ) | |

APPELWICK, J. — Thomas appeals his convictions for violation of a protection order, third degree driving while license suspended or revoked, first degree unlawful possession of a firearm, and unlawful possession of a controlled substance (cocaine). Thomas contends that the procedure used for peremptory challenges violated his public trial right. He argues that the statements he made to a community corrections officer while handcuffed in the back of a patrol car should have been suppressed, because he was not first given Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), warnings. He challenges the prosecutor's repeated use of the phrase "we know" in closing. He argues that the trial court should have dismissed the cocaine possession charge under the mandatory joinder rule, because it was not presented to the jury in the first trial. He asserts a double jeopardy violation for the same reason. He argues, and the State concedes, that his misdemeanor sentences exceed the statutory maximum by one day. We affirm, but remand for correction of a sentencing error.

## FACTS

On June 24, 2012, Officer Reginald Gutierrez was dispatched to 4840 South I Street in Tacoma for possible narcotics activity at the house. When Gutierrez arrived, he approached Derrick Thomas, who was outside the house detailing a car. Gutierrez asked

Thomas where he lived. Thomas responded, "'Here'" and pointed at the 4840 South I Street house. Gutierrez requested identification from Thomas. Thomas replied that he did not have any. Gutierrez then asked Thomas for his name and date of birth. Not believing Thomas's answer, Gutierrez detained Thomas. Thomas then revealed his name and admitted he had an outstanding arrest warrant. Gutierrez arrested Thomas and read him his Miranda rights.

Thomas was released from jail on July 14, 2012. The address he registered with the Department of Corrections (DOC) was his mother's home on South Hosmer in Tacoma.

DOC Officer Thomas Grabski decided to stake out the 4840 South I Street house the day Thomas was released. Grabski had received information from another officer that Thomas was living at the house in violation of community custody, and that firearms and controlled substances might be located there. Grabski is a community corrections officer charged with seeking out probation violators. He was not actively supervising Thomas at the time.

Officer Grabski recruited five police officers to assist him in investigating whether Thomas was in possession of guns and drugs. Grabski briefed the officers and instructed them to pull Thomas over on his orders.

Around 7:00 p.m., Grabski watched a vehicle pull up to the front of the 4840 South I Street house. Thomas got out of the car and entered the house without knocking. Thomas's driver's license was suspended at the time. A few minutes later, Thomas left the house and got back into the car. Later that night, Thomas again drove up to the

2

house. Thomas, a woman, and two children got out and went inside. A short time later, Thomas left the house and drove away again.

As Thomas drove away, Grabski radioed to the assisting officers to pull Thomas over for driving with a suspended license. When Grabski arrived, Thomas was handcuffed in the back of a patrol car. Grabski did not inform Thomas of his Miranda rights. Grabski asked Thomas whether he lived at the 4840 South I Street residence, whether he had property inside, and whether he had a key to the house. Thomas responded that he had property there and a key to the house, but did not live there.

Grabski then accompanied Thomas and the other officers back to the house to search for firearms and drugs. Thomas remained detained in the patrol car during the search. The woman who answered the door said Thomas was her boyfriend and they had children together. She told the officers that Thomas did not live there, but kept some property there.

The officers searched the entire house, except the children's bedrooms. They found men's clothing in the master bedroom, as well as a loaded shotgun and shotgun shells. They also discovered scales and a small baggie of cocaine inside a pill bottle. The cocaine was located in a drawer with both men's and women's underwear. They found court and DOC documents, as well as a receipt, in Thomas's name in the master bedroom.

On July 16, 2012, the State charged Thomas with first degree unlawful possession of a firearm (Count I), violation of a protection order (Count II), and third degree driving while license suspended or revoked (DWLS, Count III).

3

On October 16, 2012, the State filed an amended information in open court adding a charge of unlawful possession of a controlled substance, specifically cocaine. Thomas was arraigned on the additional charge the same day.

The proceedings were then recessed for nearly two months. Trial commenced on December 10, 2012. However, because the October amended information was not filed until January 2013, it did not appear in the computer record at the time of trial. The parties proceeded on only the three original charges: unlawful possession of a firearm, violation of a protection order, and DWLS. Defense counsel later recalled that the State told her that it decided not to proceed on the cocaine possession charge. Thomas did not move to consolidate the charges.

At trial, Thomas objected to admission of his statements to Grabski while detained in the patrol car. The trial court noted Thomas's standing objection. Nevertheless, Grabski testified that Thomas said he had a key to the 4840 South I Street house, had just come from there, and kept personal belongings there.

The jury found Thomas guilty of the two misdemeanors: violation of a protection order and third degree DWLS. RCW 46.20.342(1)(c); RCW 26.50.110(1). However, the jury could not reach a verdict on unlawful possession of a firearm. After polling the jury, the trial court declared a mistrial on that charge. The State immediately announced its intention to proceed to retrial. The court imposed a one year suspended sentence for the two misdemeanors.

On January 17, 2013, the State charged Thomas by amended information with first degree unlawful possession of a firearm (Count I) and unlawful possession of a cocaine (Count IV). Thomas was arraigned the same day.

4

On January 23, 2013, Thomas moved to dismiss the cocaine possession charge with prejudice under the mandatory joinder rule, CrR 4.3.1. Thomas argued that due process and speedy trial considerations prohibited the State from adding a new charge after the original trial. The trial court denied Thomas's motion to dismiss.

At Thomas's second trial, the jury heard recorded jail calls in which Thomas tells a woman that he does not want police to know where he lives, so he would give his mother's address and only come home late. He expressed concern about police tearing "our" room apart every week. In another call, the same woman says that she put Thomas's clothes away and discusses "when you come home." The jury also heard a call in which Thomas tells a friend that he was arrested at "my house." His friend asks him, "Your baby mama's house?" Thomas responds affirmatively. Thomas then repeatedly refers to "my house."

The jury found Thomas guilty of unlawful possession of a firearm and unlawful possession of cocaine. Thomas appeals.

## DISCUSSION

### I. Public Trial Right

Thomas argues the trial court's peremptory challenge procedure violated his public trial right. He asserts that peremptory challenges were closed to the public, but the court did not analyze the State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995), factors before conducting this portion of voir dire. In Bone-Club, the Washington Supreme Court set forth a five-factor test that courts must use to evaluate the constitutionality of a proposed courtroom closure. Id. at 258-59.

At both trials, the parties exercised their peremptory challenges by silently passing a piece of paper back and forth. At the first trial, the court stated:

> At this time, ladies and gentlemen of the jury, the attorneys will be passing back and forth this sheet of paper that Ms. [Jane] Pierson is picking up and delivering to Mr. [James] Curtis. And they're going to be writing down their peremptory challenges.
>
> During this process, the only rule is you have to stay in your seat, although you could stand up and stretch. But we don't want you to move around because, if you start playing musical chairs, we would have more difficulty remembering who answered what to the questions. So if you'd like to speak softly to your neighbor, if you'd like to pull out knitting or a book, please make yourself comfortable. This usually takes about ten minutes.

Then the record notes, "(Peremptory challenges exercised.)" An unreported sidebar followed. The trial court subsequently announced, "Ladies and gentlemen of the jury, the lawyers have exercised their peremptory challenges," and called out the numbers of the jurors to be seated for trial. The trial court followed the same procedure in the second trial. During both trials, the parties' peremptory challenge forms were filed in open court the same day they were exercised. The forms specified each party's peremptory challenges, the order in which they made the challenges, and the challenged jurors' name and number.

Whether the right to a public trial has been violated is a question of law that we review de novo. State v. Sublett, 176 Wn.2d 58, 70, 292 P.3d 715 (2012). The Sixth Amendment and article I, section 22 of the Washington Constitution guarantee a criminal defendant's right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Article I, section 10 of the Washington Constitution provides the additional guarantee that "[j]ustice in all cases shall be administered openly, and without unnecessary delay."

There is a strong presumption that courts are to be open at all stages of trial. Sublett, 176 Wn.2d at 70. However, the public trial right is not absolute. Id. at 71. It may be overcome "to serve an overriding interest based on findings that closure is essential and narrowly tailored to preserve higher values." Id. To determine whether the public trial right applies, the Court recently adopted the "experience and logic" test. Id. at 72-73. The experience prong asks whether the place and process have historically been open to the press and the general public. Id. at 73. The logic prong asks whether public access plays a significant positive role in the functioning of the particular process in question. Id. If yes to both, the public trial right attaches and the Bone-Club factors must be considered before any closure. Id.

The right to a public trial extends to voir dire of prospective jurors. Presley v. Georgia, 558 U.S. 209, 213, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010); State v. Wise, 176 Wn.2d 1, 11, 288 P.3d 1113 (2012). In cases where Washington courts found an improper closure during jury selection, the trial court conducted discussions with and/or dismissed potential jurors in a closed courtroom, chambers, or other private setting, outside the public eye. See, e.g., Wise, 176 Wn.2d at 6-7 (partial voir dire in chambers); State v. Brightman, 155 Wn.2d 506, 509, 122 P.3d 150 (2005) (courtroom closed to public during voir dire); State v. Tinh Trinh Lam, 161 Wn. App. 299, 301, 254 P.3d 891 (2011) (interview of juror in chambers), review granted, 176 Wn.2d 1031, 299 P.3d 20 (2013).

However, not every interaction between the court, counsel, and defendants will implicate the public trial right or constitute a closure if closed to the public. Sublett, 176 Wn.2d at 71. Thus, before determining whether there is a public trial violation, we must first consider whether the proceeding at issue constitutes a closure at all. Id. A closure

"occurs when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011).

The record here does not support Thomas's claim that a closure occurred. Voir dire, including individual questioning of prospective jurors, took place in open court. The peremptory challenge form identified challenged jurors by name and number, the order in which counsel made the challenges, and the party that made them. Members of the public saw the dismissed jurors leave and saw which jurors remained. The court did not orally recount which party challenged each juror. But, the trial court filed the peremptory challenge forms in open court the same day they were exercised. The forms then became part of the public record. In the first trial, defense counsel made a Batson[1] challenge to one of the State's peremptory challenges. This was conducted on the record in open court.

Furthermore, Division Three of this court recently held that exercising for-cause and peremptory challenges in a sidebar conference does not violate the public trial right. State v. Love, 176 Wn. App. 911, 920, 309 P.3d 1209 (2013). Applying the experience and logic test, the Love court found no evidence suggesting that peremptory challenges were historically made in public. Id. at 918. And, the court reasoned that the written record of the challenges satisfied the public's interest and assured "that all activities were conducted aboveboard, even if not within public earshot." Id. at 920. Adopting Love, Division Two of this court also held that exercising peremptory challenges at a clerk's

---

[1] Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

station does not violate the public trial right. State v. Dunn, __Wn. App.__, 321 P.3d 1283, 1285 (2014).

Here, the trial court's procedure, together with timely public access to the record, protected both "the core values of the public trial right" and the open administration of justice. Sublett, 176 Wn.2d at 73. Because there was no courtroom closure, we hold that no public trial right violation occurred.

## II. Statements to Officer Grabski

Thomas argues that it constituted custodial interrogation when Officer Grabski questioned him while he was handcuffed and detained in the back of a patrol car. At no time during the encounter was Thomas advised of his Miranda rights. Therefore, Thomas asserts, the trial court should have suppressed his statements to Officer Grabski that he had property at 4840 South I Street, had just come from there, and had a key to the house.

We review Miranda issues de novo. State v. Daniels, 160 Wn.2d 256, 261, 156 P.3d 905 (2007), adhered to on recons., 165 Wn.2d 627, 200 P.3d 711 (2009). Miranda warnings must be given whenever a suspect is subject to custodial interrogation by a State agent. Miranda, 384 U.S. at 467-68. If police conduct a custodial interrogation without Miranda warnings, statements made by the suspect during the interrogation must be suppressed. Id. at 479.

However, statements admitted in violation of Miranda are subject to harmless error analysis. State v. Reuben, 62 Wn. App. 620, 626, 814 P.2d 1177 (1991). A constitutional error is harmless if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. State v. Guloy, 104 Wn.2d 412,

425, 705 P.2d 1182 (1985). Assuming without deciding that Thomas's <u>Miranda</u> challenge has merit, we proceed to Thomas's argument that the error was not harmless. Thomas asserts that his statements to Grabski provided circumstantial evidence that he had dominion and control over the 4840 South I Street house sufficient to establish his possession of the gun and cocaine found inside.

Under the "overwhelming untainted evidence" test, we look at only the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. <u>Id.</u> at 426. The following untainted evidence was elicited at Thomas's second trial demonstrating his possession of the gun and cocaine. Gutierrez testified that on June 24, Thomas pointed to the 4840 South I Street house and said, "'I live here.'" Grabski testified that he watched Thomas pull up to the house and go inside without knocking. Later that same evening, Grabski saw Thomas again enter the home with a woman and two children.

During the search of the home, Grabski found men's clothing in the master bedroom, as well as DOC documents in Thomas's name. Testimony was elicited that the woman at 4840 South I Street was Thomas's girlfriend and they had children together. The woman said that Thomas sometimes lived at the house, but did not currently live there.

The State also introduced jail calls where Thomas said he was arrested at "my house"—referring to his "baby mama's house." In another call, he told a woman he did not want police to know where he lived, so he would give his mother's address and come home late. On another occasion, the same woman told him that she put all his clothes away and discussed "when you come home."

10

This untainted evidence overwhelmingly established that Thomas had property at the 4840 South I Street house and was living there. Therefore, we hold that any error in admitting Thomas's statements to Grabski was harmless.

III.    Inconsistent Oral and Written Rulings

Thomas argues that the trial court erred in making written findings and conclusions that he waived his Miranda rights before making the June statements to Officer Gutierrez. Thomas asks this court to vacate the erroneous findings and conclusions.

Officer Gutierrez testified that on June 24, 2012, he encountered Thomas on the street and asked him where he lived. Thomas pointed at the 4840 South I Street house and said, "Here." A short time later, Thomas revealed his name to Gutierrez and admitted that he had an outstanding arrest warrant. Gutierrez then arrested Thomas and Mirandized him. Gutierrez did not question Thomas after advising him of his Miranda rights. In a December 11, 2012 oral ruling, the trial court held that when Thomas told Gutierrez where he lived, it was an initial social contact, so Gutierrez did not yet need to advise Thomas of his Miranda rights. Thomas does not dispute the correctness of this ruling.

However, on January 18, 2013, the trial court entered the written findings of fact:

4.    The defendant was arrested and read his Miranda warnings. The defendant waived his right to remain silent and agreed to speak with the officer.

5.    The defendant told the officer that he resided at the 4840 South I residence.

The trial court then entered the following conclusions of law:

1.    On June 24, 2012, the defendant was arrested and read his [Miranda] warnings.

2.     The defendant made a knowing and voluntary waiver of his [Miranda] rights and agreed to speak with the arresting officer.

3.     The defendant statements are admissible.

No remand is necessary where ambiguous written findings of fact are supplemented by the trial court's oral ruling. State v. Motherwell, 114 Wn.2d 353, 358 n.2, 788 P. 2d 1066 (1990). Similarly, failure to enter written findings and conclusions under CrR 3.5 and 3.6 does not necessitate reversal where the trial court's comprehensive oral ruling is sufficient to allow appellate review. State v. Bynum, 76 Wn. App. 262, 266, 884 P.2d 10 (1994). The trial court's written findings and conclusions are at best ambiguous. The trial court's oral ruling is sufficient to allow our review, and Thomas does not dispute its correctness. We therefore simply disregard the trial court's written ruling.

IV.   Prosecutorial Misconduct

Thomas argues that it constituted prosecutorial misconduct when the State repeatedly used the phrase "we know" in closing. Thomas asserts that this improperly aligned the jury with the prosecution, placed the prestige of the prosecutor's office in the balance, and expressed the prosecutor's personal opinion of Thomas's guilt.

Prosecutorial misconduct is grounds for reversal if the prosecutor's conduct was both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). We review a prosecutor's conduct in the full context of the trial, including the evidence presented, the total argument, the issues in the case, and the jury instructions. Id. A defendant suffers prejudice only when there is a substantial likelihood that the prosecutor's conduct affected the jury's verdict. Id. Absent a timely objection, reversal is

required only if the conduct was so flagrant and ill-intentioned that it caused an enduring and resulting prejudice that could not have been neutralized by a curative jury instruction. State v. Warren, 165 Wn.2d 17, 43, 195 P.3d 940 (2008).

Prosecutors have wide latitude in closing to draw reasonable inferences from the evidence. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). However, they are prohibited from using their power and prestige to sway the jury. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 706, 286 P.3d 673 (2012). Likewise, they must refrain from making comments "calculated to align the jury with the prosecutor and against the [accused]." State v. Reed, 102 Wn.2d 140, 147-48, 684 P.2d 699 (1984).

The Ninth Circuit recognized that using "we know" blurs the line between legitimate summary of evidence and improper vouching. United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005). The Younger court emphasized that prosecutors should not use the phrase in closing. Id. However, in that case, the prosecutors used the phrase to "marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements." Id. Thus, the prosecutors' statements were not improper. Id. The Eighth Circuit likewise held that "we know" is not plain error if used to refer the jury to the government's evidence and summarize the government's case against the defendant. United States v. Bentley, 561 F.3d 803, 812 (8th Cir. 2009). By contrast, "we know" is improper when "it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility." Id.

13

Here, the prosecutor used "we know" several times to simply recount the State's evidence. For instance, the prosecutor stated that "we know" the date of Thomas's arrest, that cocaine was found in the dresser drawer, that the seized shotgun was loaded, and that DOC Officer Grabski began an investigation. Such use of "we know" was not improper.

However, other instances bordered on improper, because the prosecutor used "we know" to suggest special knowledge of the evidence. For instance, referring to Thomas's use of a different address, he stated, "But we know why he gave it. . . . He did not want [the] DOC to tear apart his house." In the same vein, he asked, "So the question is, why didn't he say he lived there? We know why. He didn't want Officer Grabski to search the house." Again, referring to why Thomas's girlfriend said he did not live at the house, "Why would she tell Grabski that? We know why, because she knew what the stakes were. She knew that he didn't want them searching the room." Then the prosecutor asked the jury why Thomas was so concerned about DOC searching in his room. He answered, "We know why. We know why." He soon after reiterated, "Because we know they were both afraid and wanted to avoid a DOC search." Defense counsel did not object to these statements.

Though possibly improper, Thomas has failed to show that this latter use of "we know" was so flagrant and ill-intentioned that it caused enduring and resulting prejudice that no curative instruction could have neutralized. If Thomas objected, the trial court could have instructed the prosecutor to refrain from using the phrase. Or, the court could have at least reminded the jury that the prosecutor's argument is not evidence. This likely would have cured any resulting prejudice.

And, Thomas has failed to show prejudice. Thomas did not dispute that the State found cocaine and a loaded shotgun in the master bedroom at 4840 South I Street. Rather, he disputed his possession of those items. However, as recounted above, there was significant untainted evidence that Thomas had property at the house and lived there. This evidence came in the form of officer testimony, recorded jail calls, seized documents with Thomas's name on them, and Thomas's own statement to Officer Gutierrez. As such, we hold that the prosecutor's use of the phrase "we know" did not constitute prejudicial error.

V. Mandatory Joinder

Thomas argues that the trial court erred in denying his motion to dismiss the cocaine possession charge under the mandatory joinder rule, CrR 4.3.1. We conduct de novo review of the trial court's application of the mandatory joinder rule. State v. Kindsvogel, 149 Wn.2d 477, 480, 69 P.3d 870 (2003); State v. Kenyon, 150 Wn. App. 826, 833, 208 P.3d 1291 (2009).

CrR 4.3.1(b) makes joinder of "related offenses" mandatory. In general, under this rule, a defendant who has been tried for one offense is entitled to dismissal of a charge for a related offense. CrR 4.3.1(b)(3). CrR 4.3.1(b)(2) provides that when a defendant has been charged with two or more related offenses, he or she may move to consolidate them for trial. Failure to move to consolidate "constitutes a waiver of any right of consolidation as to related offenses with which the defendant knew he or she was charged." CrR 4.3.1(b)(2). CrR 4.3.1(b)(3) then specifies that a "defendant who has been tried for one offense may thereafter move to dismiss a charge for a related offense, unless

15

a motion for consolidation of these offenses was previously denied or <u>the right of consolidation was waived as provided in this rule</u>." (Emphasis added.)

Thomas argues that he did not need to move to consolidate in order to attain subsequent dismissal. He asserts that it was not the role of defense counsel to urge her client to be prosecuted. He also points out that his counsel informally approached the prosecutor about the cocaine possession charge and was told that the State opted not to proceed.

However, the language of CrR 4.3.1(b) is clear. A defendant may seek dismissal of a related offense <u>unless</u> he waived his right of consolidation. CrR 4.3.1(b)(3). A defendant waives his right of consolidation by failing to move to consolidate when he has been charged with two or more related offenses. CrR 4.3.1(b)(2)-(3). By contrast, a defendant does not waive his right to mandatory joinder when he does not know he will later be charged with a related offense. <u>State v. Dixon</u>, 42 Wn. App. 315, 317, 711 P.2d 1046 (1985).

Here, Thomas was charged with possession of cocaine and arraigned in open court on October 16, 2012. Trial began two months later, but on only the three original charges of firearm possession, violation of a protection order, and DWLS. At this point, Thomas was aware of the cocaine possession charge. To preserve a CrR 4.3.1(b)(3) motion to dismiss, Thomas needed to move to consolidate. He failed to do so, waiving the right of consolidation. Accordingly, under the plain language of the mandatory joinder rule, Thomas could not later move to dismiss the cocaine possession charge. We hold that the trial court did not err in refusing to dismiss the cocaine possession charge under the mandatory joinder rule.

VI.   Double Jeopardy

Thomas argues that his cocaine possession conviction in the second trial violates double jeopardy, because the State abandoned that charge in the first trial under circumstances indicating a lack of evidence. Claims of double jeopardy are questions of law reviewed de novo. State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006).

Both the state and federal constitutions prohibit multiple punishments for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. Jeopardy does not attach until a defendant is actually at risk of conviction. State v. Corrado, 81 Wn. App. 640, 645, 915 P.2d 1121 (1996). Thus, jeopardy attaches when the jury is empaneled and sworn. Crist v. Bretz, 437 U.S. 28, 35, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978).

Thomas is correct that retrial is impermissible when the circumstances suggest that the State's action was motivated by a concern that it could not prove its case. State v. Wright, 165 Wn.2d 783, 805, 203 P.3d 1027 (2009). In Downum v. United States, the prosecutor requested a midtrial dismissal due to the unavailability of a key prosecution witness. 372 U.S. 734, 735, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963). The Supreme Court held that double jeopardy barred retrial. Id. at 737-38.

Jeopardy did not attach here. The jury was never empaneled and sworn on the cocaine possession charge at the first trial. Thomas was therefore not at risk of being convicted for cocaine possession. Nor did the State move to dismiss the cocaine possession charge during the first trial based on lack of evidence, making this case distinguishable from Downum. Any error went to mandatory joinder, which does not implicate double jeopardy. State v. Dallas, 126 Wn.2d 324, 330-31, 892 P.2d 1082

(1995). As established above, Thomas waived his right to mandatory joinder. We hold that there is no double jeopardy violation.

## VII. Misdemeanor Sentence

Thomas argues that the trial court erred in sentencing him to a full year on his misdemeanor convictions. The maximum sentence for a gross misdemeanor is 364 days. RCW 9.92.020. The State concedes error. We accept the State's concession and remand for correction of Thomas's misdemeanor sentence, because it exceeds the statutory maximum by a day. In re Pers. Restraint of Mayer, 128 Wn. App. 694, 701-02, 117 P.3d 353 (2005).

## VIII. Statement of Additional Grounds

In his statement of additional grounds, Thomas argues that the search of the 4840 South I Street house and seizure of evidence was unlawful, because the address was not his registered address and he claimed he did not live there.

Individuals under community supervision may be searched based on a well-founded or reasonable suspicion of a probation violation. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009). Despite this lesser expectation of privacy, though, the Washington Supreme Court held that a probation officer must have probable cause to believe that a probationer resides at a particular residence before searching that residence. Id. at 630. Probable cause exists when the officer has information that would lead a person of reasonable caution to believe that the probationer lives at the place to be searched. Id. The information known to the officer must be reasonably trustworthy. Id. Only facts and knowledge available to the officer at the time of the search should be considered. Id. at 630-31.

Here, Grabski received a tip from another officer that Thomas was living at the 4840 South I Street house, in violation of his community custody. Grabski also knew from past police reports and jail information that Thomas identified that address as his home. Then, while staking out the house, Grabski observed Thomas enter without knocking. Thomas left and returned some time later with a woman and two children, and again entered the home. Based on this information, we hold that Grabski had probable cause to believe that Thomas resided at the 4840 South I Street house.[2] As such, the search and seizure were lawful.

We affirm, but remand for correction of the sentencing error.

WE CONCUR:

---

[2] Because we do not decide whether Thomas's statements to Grabski while handcuffed in the patrol car were admitted in error, we do not consider that evidence in support of probable cause.