# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86394-1-I |
| Respondent, | DIVISION ONE |
| v. | OPINION PUBLISHED IN PART |
| JUSTIN SMITH, | |
| Appellant. | |

FELDMAN, J. — In 2021, Justin Smith was convicted of first degree rape of a child and received a suspended sentence under the special sex offender sentencing alternative (SSOSA) statute, RCW 9.94A.670. The State subsequently filed a petition to revoke Smith's SSOSA alleging he violated the conditions of his suspended sentence by using an unapproved smartphone to view child pornography and communicate with minor children over the internet. In 2024, following an evidentiary hearing, the trial court issued an order finding the State had proved its alleged violations, revoking Smith's suspended sentence, and reinstating his original sentence.

On appeal from this order, Smith raises several arguments regarding the constitutionality of sentencing conditions restricting his use of computers and the internet, the revocation of his SSOSA, and the imposition of various legal financial

obligations. In the published portion of this opinion, we reject Smith's arguments regarding the constitutionality of the sentencing conditions and revocation of the SSOSA. In the unpublished portion of the opinion, we address Smith's remaining arguments, including those set forth in his statement of additional grounds. We remand for the trial court to correct an apparent scrivener's error in the order revoking Smith's SSOSA, but in all other respects we affirm.

I

A.      Factual background and sentencing proceedings

In 2019, Smith raped his 7-year-old daughter. He subsequently pleaded guilty to first degree rape of a child, a class A felony. Before his sentencing hearing, Smith filed a memorandum requesting that the court impose a SSOSA and attached two documents in support of this request. The first document was a "release plan" authored by Erin Hill, a social worker, that, according to Smith, would "ensure M[r]. Smith's seamless transition into treatment services." In the release plan, Hill stated in relevant part, "It is my understanding that the Department of Corrections (DOC) will provide comprehensive monitoring of Mr. Smith to ensure that he does not have contact with minors or inappropriate internet access."

The second document was a psychosexual evaluation report authored by Christmas Covell, a psychologist who was retained by Smith. The stated purpose of this evaluation was to "inform decisions regarding Mr. Smith's appropriateness for community-based treatment" under a SSOSA and "[t]o that end, . . . help decision-makers in understanding Mr. Smith's psychological functioning, including his sexual functioning and risk for future sexual offense behavior, and if relevant,

any related treatment and management needs." Smith's memorandum stressed, "[I]t is crucial that the Court have adequate time to review Dr. Covell's highly detailed thirty-page report."

Dr. Covell's report, which was based largely on her interview of Smith, describes in great detail how Smith used the internet to view child pornography. Smith admitted that he began watching online pornography at age seven and has "a long history (several years) of pursuing sexually explicit/abusive images of prepubescent and peri-pubescent minors (largely females), and of masturbating to these images." Smith specified that he "took a strong preference to images or videos featuring sexual exploitation/abuse of minors between the ages of seven and 14." Smith also told Dr. Covell he fantasizes about having sexual intercourse with minor children and that this fantasy "mostly roots from seeing pornography that included that theme." Smith explained he eventually "went to the dark web" to find sexualized images of children.[1]

Smith also revealed to Dr. Covell that he used the internet to communicate with minor children for sexual purposes. Smith divulged that he "has chatted sexually on-line fairly extensively" with adults and minor children via dating websites, social media (such as Facebook), and online gaming platforms. Smith estimated that he has "chatted sexually with" 100 women in "on-line venues" and

---

[1] "The 'dark web' is the term used to denote parts of the Internet largely unseen by the average user. Characterized as a 'private global computer network that enables users to conduct anonymous transactions without revealing any trace of their location,' the dark web requires specialized tools or interfaces to access." *Wash. Pub. Emps. Ass'n v. Wash. State Cent. for Childhood Deafness & Hearing Loss*, 194 Wn.2d 484, 514 n.16, 450 P.3d 601 (2019) (Wiggins, J., dissenting) (quoting *United States v. Werdene*, 883 F.3d 204, 206 n.1 (3rd Cir. 2018)) (internal quotation marks omitted).

has met 20 of these women, 5 of whom "were underage," to "engage in sexual contact."

Based on this information, Dr. Covell concluded, "A comprehensive risk assessment, considering Mr. Smith's known history, characteristics, and current circumstances place[s] him at an Above Average risk for engaging in future sexual offense behaviors." Dr. Covell also observed that Smith "endorsed a tendency towards recklessness, impulsivity, and irresponsibility," has "a tendency towards deceitfulness," and "has recent history of efforts to circumvent rules/restrictions" regarding his supervision during the pendency of his case. Nonetheless, Dr. Covell stated Smith "can be successful in a community-based treatment program as part of a SSOSA, with appropriate and sufficient structure and support." But Dr. Covell clarified that "[i]f Mr. Smith is to be placed in a community setting, sufficient structure and external oversight/management strategies will . . . need to be in place to support his ability to participate effectively in these [treatment] interventions and manage his presenting level of risk."

Regarding recommended "interventions and risk management strategies," Dr. Covell suggested that Smith's treatment include "[d]evelopment of understanding of offense behaviors and immediate risk/precursors, and development of a related appropriate intervention/relapse prevention plan (including a safety plan for use of digital devices and the internet)." Dr. Covell also recommended that Smith's "unsupervised contact with minors be limited to incidental contact in public places" due to his "identified difficulty with deviant

4

arousal to minors, history of seeking out relationships/sexual contact with adolescents, and sexual compulsivity, as well as his offense conduct."

Especially relevant here, Dr. Covell recommended that Smith have "[r]estricted or monitored access to venues or technologies that cater to or provide access [to] casual or illegal sexual activity," and provided the following reasons for this recommendation:

> Given the risk needs noted in the area of sexual preoccupation and coping, as well as his offense behaviors, Mr. Smith should also be expected to refrain from use or perusal of erotic or sexually explicit materials, or visiting establishments/locations (on-line or off-line) where erotic or sexually explicit materials are sold or that specialize in impersonal/casual sexual activity (e.g., strip clubs, internet sex-clubs, apps, chat rooms or message boards with sexual or 'hookup' themes, or Craig's list personal or casual encounter ads, etc.) unless otherwise directed/recommended by his therapist for therapeutic purposes . . . . With his history of use of internet technology to pursue casual sexual activity, view sexually abusive/exploitative images featuring minors, and to sexually chat with/meet adolescent minors, it is recommended that Mr. Smith be restricted from internet use/access, *unless regulated and monitored*. While total bans of the internet and internet-capable or recording devices may be useful in the short term, long-term bans are not realistic or effective in assisting offenders to develop healthy relationships with and safe, legal use of internet and recording technologies that are both ubiquitous and an increasingly necessary part of community living. It is further recommended that Mr. Smith be allowed the opportunity for internet access in the future, with the support and oversight of his community therapist and community corrections officer. It is further recommended that a safety or boundary plan be developed to support Mr. Smith's efforts to utilize digital media, devices and the internet in a healthy manner; this plan should include limiting Mr. Smith's access to specific internet-capable and/or recording devices (e.g., to specifically identified devices and/or locations and situations), and provisions for monitoring his use and compliance with the plan (e.g., via use of direct supervision/chaperoning, monitoring software, and/or use of maintenance polygraph testing).

Dr. Covell also noted, "Changes to the parameters/conditions for access to, possession of, and use of computer technology and/or internet capable devices, should be determined at the recommendation/discretion of Mr. Smith's therapist, with consideration of Mr. Smith's treatment/rehabilitation needs."

At the sentencing hearing on October 6, 2021, the prosecutor objected to a SSOSA based on his "significant concerns" that Smith could not be "safely monitored in the community." The prosecutor stated that while Smith's crime of conviction was "singular in nature," the evaluation revealed "several crimes against several [individuals], as well as offenses involving the internet, things that he could be charged for if that were -- in a different setting." Regarding DOC's supervision of Smith in the community, the prosecutor asked the court to adopt the State's proposed list of community custody conditions (entitled "Appendix 4.2") and stated, "I will work with [defense counsel] if he has specific objections [to these proposed conditions]. We can work with that."

In response, defense counsel argued a SSOSA was appropriate based on Dr. Covell's recommendations. Defense counsel stated, "[W]hat Dr. Covell said is Mr. Smith needs structure. . . . He needs to work very hard for a very long time to address these problems, and that is why Dr. Covell recommended the series of very detailed conclusions she issued, and why we entered into the trouble and expense of retaining Social Worker Ms. Hill." Additionally, defense counsel stated that Smith "recognizes this is not the easy way out. This is, in fact, the harder way out of taking this plea and coming forward and being honest and trying to confront his demons." Defense counsel also assured the court that Smith has "signed

6

himself up for a lifetime of supervision. He can at any time if he violates conditions of his [SSOSA] be locked up for a very significant period of time."

In deciding whether to grant a SSOSA, the sentencing court explained

[T]he challenge here is . . . whether to conclude that because of the array of misconduct in your past, the Court can have confidence the community safety will be well served by authorizing you the opportunity to receive treatment within the community, or whether community safety is better honored by taking you into custody and having you serve a lengthy prison term."

The court noted that Dr. Covell's report was "one of the most detailed evaluations I have ever read" and acknowledged it "reveals a lot of conduct in your past, which . . . could have been charged criminally if it had been known crimes that relate to sexual misconduct, as well as other crimes." The sentencing court ultimately granted Smith's request for a SSOSA, imposed a sentence of confinement with a minimum term of 108 months and a maximum term of life (all of which was suspended except for 12 months, which Smith had already served), and imposed a lifetime of community custody. The court told Smith his SSOSA would be a "rigorous program" and "is not going to be easy for you," but added, "Because your [SSOSA] evaluation was so forthright, I have confidence that you are capable of succeeding within that rigorous program."

Regarding conditions of community custody, the court stated that "strong conditions for community safety" and "conditions that relate to not having contact with minor children" were "warranted in this case" because "it is hard to imagine" a case where "the child's trust was breached" more than in this case. The court

7

adopted the State's proposed Appendix 4.2 which included the following conditions:

19. Do not possess, use, access or view any sexually explicit material as defined by RCW 9.68.130 or erotic materials as defined by RCW 9.68.050 or any material depicting any person engaged in sexually explicit conduct as defined by RCW 9.68A.011(4) unless given prior approval by your sexual deviancy provider.

. . . .

21. Do not access the Internet on any computer, phone, or computer-related device with access to the Internet or on-line computer service except as necessary for employment purposes (including job searches) in any location, unless such access is approved in advance by the supervising Community Corrections Officer [(CCO)] and your treatment provider. The CCO is permitted to make random searches of any computer, phone, or computer-related device to which the defendant has access to monitor compliance with this condition.

22. Do not use computer chat rooms.

. . . .

24. You may not possess or maintain access to a computer, unless specifically authorized by your supervising [CCO]. You may not possess any computer parts or peripherals, including but not limited to hard drives, storage devices, digital cameras, web cams, wireless video devices or receivers, CD/DVD burners, or any device to store to reproduce digital media or storage.

The court clarified that the conditions that "are most important to the Court" included "sexual deviancy treatment, addressing appropriate use of the internet[,] . . . and hav[ing] . . . chaperoned contact with minor children." The court added that Smith "has also accessed sexually explicit materials on the internet and through other electronic means, which will . . . for his therapeutic benefit require

him not to access what has become such a part of our life without appropriate approval from his treatment provider and community custody officer."

B.      Revocation proceedings

In December 2023, Smith failed a polygraph test administered by DOC after being "asked about possessing any unauthorized electronic devices."[2]  Based on this failure, Smith's CCO, Parmvir Gill, suspected Smith "was possibly communicating with minors" and "looking up victims[] [and] child pornography" in violation of his sentencing conditions.  On December 12, 2023, Gill and two other CCOs went to Smith's apartment and obtained Smith's consent to search the apartment.  During their search, the CCOs discovered three cell phones:  Smith's Google smartphone (which was the only electronic device that his CCO had "approved"), a cell phone belonging to Smith's girlfriend, and a third, Samsung smartphone located in the bedroom on Smith's side of the bed.  Gill asked Smith to unlock the Samsung smartphone, which Smith was able to do using his fingerprint.  The CCOs placed Smith under arrest, at which point Smith stated, "fuck, I'm going to prison for the rest of my life."  When the CCOs asked Smith what they were "going to find on this phone," Smith stated they would find "lewd images" and "child pornography" that he obtained on the "dark web."

The CCOs then returned to their field office and conducted a search of the Samsung smartphone.   During   this   search,   the   CCOs   "found   multiple conversations with minors, images of minor age females ranging from 8 to 16

_____

[2] Condition 8 of Smith's SSOSA sentence required him to "participate in . . . polygraph examinations as directed by the supervising [CCO], to ensure conditions of community custody."

9

[years old] . . . , [n]ude images, [and] pornography." The CCOs discovered Smith had used the Samsung smartphone to conduct online searches relating to adult pornography and to purchase images and videos depicting child pornography. Additionally, the CCOs observed that Smith was using the Samsung smartphone to engage in conversations with minor children via "Snapchat, Twitter, Facebook," and "text messaging" that "were sexual in nature."

Following these events, Gill filed a notice in the trial court alleging Smith violated conditions 19, 21, 22, and 24 of his SSOSA and attached reports signed under penalty of perjury by himself and the two other CCOs describing their search of Smith's residence and the Samsung smartphone on December 12, 2023. Gill recommended that the trial court revoke Smith's SSOSA because these violations demonstrate he "is a significant threat to the community and has full intention on victimizing minor aged females, if he hasn't done so already." Smith's sex offender treatment provider, Jenny Johnson-Riley, also filed a report with the trial court stating that she was "terminating [Smith's] treatment with this office immediately" because DOC's alleged violations were "egregious" and revealed that Smith "has been dishonest with me and his treatment group." Like Gill, Johnson-Riley recommended that the trial court revoke Smith's SSOSA "given the nature of his violations."

On December 27, 2023, the State filed a petition to revoke Smith's SSOSA alleging he "violated or failed to comply with five requirement(s) of conditions of [his] sentence . . . as follows:"

10

1. On or before December 12, 2023, possessing/accessing unapproved electronic equipment capable of storing images of minors, a Samsung smartphone, without authorization from a CCO.

2. On or before December 12, 2023, possessing/viewing pornographic material via iPhone smartphone, over 100 images of multiple minor aged girls fully exposing their bare vagina and breast.

3. On or before December 12, 2023, communicating with a prohibited person, multiple minor females.

4. On or before December 12, 2023, possessing/viewing pornographic material via Samsung smartphone.

5. On or before December 12, 2023, using internet chatrooms to include Snapchat, Facebook, and Twitter to communicate with minors.

In response, Smith filed a brief arguing that the sentencing conditions restricting Smith's use of computers and the internet, particularly conditions 21 and 24, were "not crime-related, must be stricken by this court, and cannot uphold a basis for a DOC search." (Capitalization omitted). Smith then averred that given the absence of "lawful evidence before the Court supporting a violation," the court "should not find Mr. Smith in violation of his SSOSA."

The trial court held an evidentiary hearing at which Gill testified in support of the State's petition. Based on Gill's testimony, the CCOs' reports, and Johnson-Riley's report, the trial court issued an oral ruling rejecting Smith's constitutional and exclusionary arguments and finding the State had proven all five of the violations alleged in its petition.[3] The court then stated, "Looking at . . . all five of

---

[3] The State's petition does not specify which sentencing conditions Smith violated; however, the materials submitted with Gill's notice of violation refer to conditions 19, 21, 22, and 24. In explaining

the violations in their entirety and at the level of deceptiveness that was occurring as a result of it, based on that deceptiveness, the Court will revoke the SSOSA sentence at this time. . . . [and] order that the original sentence be executed." The court later issued a written order on March 4, 2024 memorializing its oral rulings. Smith subsequently filed a notice of appeal seeking review of that order as well as his original judgment and sentence entered on October 6, 2021.

II

A.    Sentencing conditions

Smith's principal argument on appeal is that three conditions of community custody contained in the judgment and sentence imposing his SSOSA—namely condition 21 prohibiting unapproved internet access, condition 22 prohibiting use of computer chat rooms, and condition 24 prohibiting unauthorized possession or access of computers—are unconstitutionally overbroad and vague. In response, the State argues (1) the invited error doctrine precludes Smith from challenging the constitutionality of these sentencing conditions and (2) these conditions are not unconstitutionally overbroad or vague. We agree with the State's first argument and therefore need not reach its second.

1.    *Overview of indeterminate sentencing and SSOSA schemes*

Ordinarily, nonpersistent offenders convicted of first degree rape of a child, such as Smith, are sentenced under Washington's indeterminate sentencing scheme set forth in RCW 9.94A.507. *See State v. Clark*, 156 Wn.2d 880, 887-91,

---

its findings for each violation, the Court found that allegation 1 related to condition 21, allegations 2 and 4 related to condition 19, and allegations 3 and 5 related to condition 22.

12

134 P.3d 188 (2006) (providing overview of indeterminate sentencing scheme under former RCW 9.94A.712, the predecessor to RCW 9.94A.507). Under this scheme, the sentencing court sets a minimum term and a maximum term that consists of the statutory maximum sentence for the offense (which for a class A felony is life imprisonment), and the Independent Sentencing Review Board determines near the end of the minimum term whether to release the offender from confinement or extend the minimum term. *Id.* In other words, an offender sentenced under RCW 9.94A.507 is effectively "serving a life sentence with the *possibility of release*" upon expiration of the minimum term, and "there is no guaranty that release will occur." *See id.* at 890.

As an alternative to this potential life sentence of incarceration, "[t]he legislature enacted the SSOSA system to create a sentencing alternative for certain first time sex offenders who plead guilty and are found amenable to treatment." *State v. Pannell*, 173 Wn.2d 222, 227, 267 P.3d 349 (2011). A SSOSA grants offenders "relative freedom" and "the chance to live and work in the community so long as they comply with treatment and other conditions." *Id.* at 234. Our Supreme Court has recognized that "[t]he authority the SRA [Sentencing Reform Act] gives to courts under the SSOSA scheme is unique." *State v. Petterson*, 190 Wn.2d 92, 102, 409 P.3d 187 (2018); *see also State v. Geyer*, 19 Wn. App. 2d 321, 325 n.1, 496 P.3d 322 (2021) (noting that "[w]hen imposing a sentencing alternative," such as a SSOSA, "a court may have additional authority or flexibility" in crafting sentencing conditions). Regarding conditions of community custody, the court has clarified that the rights of an offender sentenced to a SSOSA

13

"are already diminished . . . as [they were] convicted of a sex crime and, only by the grace of the trial court, allowed to live in the community subject to stringent conditions. Those conditions . . . serve an important societal purpose in that they are limitations on [the offender's] rights that relate to the crimes [they] committed." *State v. McCormick*, 166 Wn.2d 689, 702-03, 213 P.3d 32 (2009). Conversely, "[T]he government has an important interest in protecting society, particularly minors, from a person convicted of raping a child. That interest is rationally served by imposing stringent conditions related to the crime [the offender] committed." *Id.*

Moreover, unlike a traditional sentence of community supervision, the SSOSA statute permits—and in some circumstances requires—a court to impose stringent sentencing conditions based on an examination of the offender, such as Dr. Covell's psychosexual evaluation of Smith. If an offender is eligible for a SSOSA, the court "may order an examination to determine whether the offender is amenable to treatment." RCW 9.94A.670(3). The report of the examination "shall" include "[t]he offender's offense history" and "[a]n assessment of the problems in addition to alleged deviant behaviors." RCW 9.94A.670(3)(a)(ii)-(iii). Additionally, "[t]he examiner shall assess and report regarding the offender's amenability to treatment and relative risk to the community" and provide a "proposed treatment plan" that includes "(ii) Specific issues to be addressed in the treatment and description of planned treatment modalities;" "(iii) Monitoring plans, including any requirements regarding living conditions, lifestyle requirements, and monitoring by family and others;" and "(v) Recommended crime-related prohibitions and affirmative conditions, which must include, to the extent known, an identification of

14

specific activities or behaviors that are precursors to the offender's offense cycle, including, but not limited to, activities or behaviors such as viewing or listening to pornography." RCW 9.94A.670(3)(b).

After receipt of this report, the court "shall consider," among other things, whether "the offender and the community will benefit from the use of this alternative," whether "the offender has victims in addition to the victim of the offense," whether "the offender is amenable to treatment," and the "risk the offender would present to the community, to the victim, or to persons of similar age and circumstances as the victim." RCW 9.94A.670(4). If the court grants a SSOSA, the statute requires that "[a]s conditions of the suspended sentence, the court *must* impose . . . [s]pecific prohibitions and affirmative conditions relating to the known precursor activities or behaviors identified in the proposed treatment plan under [RCW 9.94A.670(3)(b)(v)]." RCW 9.94A.670(5)(d) (emphasis added). In short, the SSOSA statute grants courts "unique" authority (*see Petterson*, 190 Wn.2d at 102) to suspend what may otherwise be a life sentence of confinement and, in exchange, impose stringent conditions of community custody based on the offense itself and the offender's activities or behaviors that are precursors to the offender's offense cycle.

2.    *Invited error*

"The invited error doctrine prohibits a party from setting up an error in the trial court then complaining of it on appeal." *In re Pers. Restraint of Tortorelli*, 149 Wn.2d 82, 94, 66 P.3d 606 (2003). "The doctrine was designed in part to prevent parties from misleading trial courts and receiving a windfall by doing so." *State v.*

15

*Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). "To determine whether the doctrine applies, the court considers 'whether the defendant affirmatively assented to the error, materially contributed to it, or benefitted from it.'" *In re Dependency of A.L.K.*, 196 Wn.2d 686, 695, 478 P.3d 63 (2020) (quoting *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 119, 340 P.3d 810 (2014) (plurality opinion)).

In *State v. Sims*, our Supreme Court acknowledged the invited error doctrine may preclude a defendant who received a SSOSA from challenging conditions of that sentence. 171 Wn.2d 436, 447 n.4, 256 P.3d 285 (2011). In that case, Sims directly appealed from the trial court's judgment and sentence imposing a SSOSA and raised, for the first time on appeal, a pre-enforcement challenge to a sentencing condition regarding geographic limitations. *Id.* at 440. The majority allowed Sims to make this argument and held that a defendant who receives a SSOSA may challenge the constitutionality of a given sentencing condition without having "every part of [the] sentence . . . revoked and remanded to the trial court for reconsideration." *Id.* at 438. The majority reasoned, "Because SSOSA sentences are of such high value to defendants, they would be unlikely to risk appealing even abhorrently unlawful or unconstitutional sentencing conditions for fear of risking the underlying SSOSA sentence." *Id.* at 447. In a dissenting opinion, Justice Stephens expressed concern that "[l]imiting appellate review to redlining invalid SSOSA conditions might . . . create the unintended incentive for defendants not to resist especially restrictive sentencing conditions in order to obtain a SSOSA, then challenge them on appeal." *Id.* at 454 n.6. In response to Justice Stephens' concern, the majority clarified, "There is no competing risk that

16

defendants will dupe a court into granting a SSOSA, relying on an unconstitutional sentencing condition, because the invited error doctrine would preclude the defendant from appealing the sentencing condition in that case." *Id.* at 447 n.4.

The instant appeal presents the invited error scenario envisioned in *Sims*. Smith requested a SSOSA to avoid receiving a potential life sentence of incarceration under the indeterminate sentencing scheme. In support of this request, Smith retained Dr. Covell to conduct a SSOSA evaluation, which concluded that Smith presented an "Above Average risk for engaging in future sexual offense behaviors" but was nonetheless amenable to a SSOSA. Dr. Covell specified that due to Smith's "history of use of internet technology to pursue casual sexual activity, view sexually abusive/exploitative images featuring minors, and to sexually chat with/meet adolescent minors," Smith's SSOSA conditions should restrict him from "internet use/access, *unless regulated and monitored*," "access[ing] . . . specific internet-capable and/or recording devices," and visiting "off-line" establishments or locations "that specialize in impersonal/casual sexual activity (e.g., . . . apps[] [and] chat rooms or message boards with sexual or 'hookup' themes . . . )." Dr. Covell even suggested that a "total ban[] of the internet and internet-capable or recording devices may be useful in the short term." Additionally, Dr. Covell described Smith as "reckless[]," "impulsiv[e]," "irresponsib[le]," "deceitful[]," and having a "recent history of efforts to circumvent rules/restrictions."

Smith then presented Dr. Covell's report to the sentencing court and implored it to impose a SSOSA based on Dr. Covell's recommendations. Defense

counsel told the sentencing court, "It is crucial that the Court have adequate time to review Dr. Covell's highly detailed thirty-page report." Defense counsel stated, "[W]hat Dr. Covell said is Mr. Smith needs structure. . . . He needs to work very hard for a very long time to address these problems, and that is why Dr. Covell recommended the series of very detailed conclusions she issued." Defense counsel also assured the court that Smith has "signed himself up for a lifetime of supervision. He can at any time if he violates conditions of his [SSOSA] be locked up for a very significant period of time."

At Smith's urging, the sentencing court granted a SSOSA and, in setting the parameters of this sentence, relied heavily on Dr. Covell's report, which the court described as "one of the most detailed evaluations I have ever read." The court told Smith his SSOSA would be a "rigorous program" and that "strong conditions for community safety" were "warranted." Specifically, the court stated "addressing appropriate use of the internet" was among the conditions that "are most important to the Court." And because Smith had "accessed sexually explicit materials on the internet and through other electronic means," the court clarified that it would prohibit Smith from "access[ing] what has become such a part of our life without appropriate approval from his treatment provider and [CCO]." In light of the sentencing court's reliance on Dr. Covell's report and express concerns about Smith's use of computers and the internet, it is clear the court would not have granted a SSOSA without also imposing significant restrictions on Smith's use of computers and the internet in the manner contemplated by sentencing conditions 21, 22, and 24. Indeed, given that Dr. Covell's report identified Smith's use of

18

computers and the internet as a "precursor" to his offense cycle, the sentencing court was arguably obligated under RCW 9.94A.670(5)(d) to impose conditions restricting Smith's use of computers and the internet when imposing a SSOSA.

After receiving the benefit of this "high value" SSOSA, *see Sims*, 171 Wn.2d at 447, Smith did not object to or otherwise challenge any of his sentencing conditions at his original sentencing hearing, on direct appeal from his judgment and sentence, or at multiple subsequent review hearings. Instead, Smith waited until he had been accused of viewing child pornography and communicating with minor children in a sexual manner to finally argue these computer- and internet-related conditions are unconstitutional as a means of excluding evidence and avoiding punishment for failing to comply with his SSOSA. The trial court acknowledged at the revocation hearing that Smith contributed to the imposition of the sentencing conditions he now claims are unconstitutional:

> [T]hese two conditions [21 and 24] . . . were requested by the defense, and by his counsel, and by his treatment providers, because this is not a normal—this is not a situation where the Court was imposing these conditions with no knowledge of this particular individual . . . . They were provided information including a 30-page psychosexual evaluation report that was requiring these conditions. And they were put forward and not objected to in this particular instance. . . .
>
> This matter has come on for a reviewing hearing held on January 5, 2022 . . . .
>
> There was also a hearing held on February 3, 2023 . . . .
>
> And at none of those situations was any motion being brought in order to actually review these conditions at that point in time.

19

Therefore, even assuming the sentencing conditions Smith challenges on appeal are unconstitutional, Smith "dupe[d]" the trial court into granting a SSOSA by assuring the court he would abide by these sentencing conditions. *See Sims*, 171 Wn.2d at 447 n.4. Accordingly, under the invited error doctrine, Smith is precluded from challenging the constitutionality of his sentencing conditions.

Smith contends the invited error doctrine does not apply because the Supreme Court subsequently "clarified" in *State v. Kelly*, 4 Wn.3d 170, 195, 561 P.3d 246 (2024), that its previous "observation" in *Sims* regarding the invited error doctrine is "no longer true." Smith's reliance on *Kelly* is misplaced because that case did not concern whether a trial court imposed an unconstitutional sentencing condition as part of a SSOSA but, rather, whether the State could appeal from a judgment and sentence that erroneously ordered two firearm enhancements to run concurrently in violation of RCW 9.94A.533 after the State proposed the order that created the error. *Id.* Because the State nonetheless argued for firearm enhancements to run consecutively and the sentencing court "exceed[ed] its authority" under this statute by running them concurrently, the court held the invited error doctrine did not preclude review. *Id.* at 195. In contrast, Smith did not argue before the sentencing court in 2021 that conditions 21, 22, and 24 were unconstitutional, and the SSOSA statute did not proscribe the sentencing court from imposing these conditions. At bottom, *Kelly* did not abrogate *Sims* with respect to the invited error doctrine in the SSOSA context. The invited error doctrine thus applies here and, as established above, precludes Smith from challenging the constitutionality of his sentencing conditions.

20

B.    Exclusionary rule

Because Smith's challenges to the constitutionality of his sentencing conditions fail, his argument that the trial court erred by "considering evidence obtained when Mr. Smith's home was searched without lawful authority" necessarily fails as well.  Article 1, section 7 of the Washington Constitution generally requires law enforcement officers to obtain a warrant to disturb a person's home or private affairs.  *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009).  But Washington law recognizes an exception to the warrant requirement for offenders under community supervision.  *Id.*  "[I]ndividuals on probation are not entitled to the full protection of article I, section 7," and, therefore, "have reduced expectations of privacy because they are serving their time outside the prison walls."  *Cornwell*, 190 Wn.2d at 301 (internal quotation marks omitted) (quoting *State v. Olsen*, 189 Wn.2d 118, 124-25, 399 P.3d 1141 (2017)).  Our legislature has codified this exception to the warrant requirement in RCW 9.94A.631(1), which states, "If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, a community corrections officer may require an offender to submit to a search and seizure of the offender's person, residence, automobile, or other personal property."  The CCO's search of the offender's property is limited to "property reasonably believed to have a nexus with the suspected probation violation."  *Cornwell*, 190 Wn.2d at 306.  "We review conclusions of law relating to the suppression of evidence de novo."  *Winterstein*, 167 Wn.2d at 628.

Here, the CCOs had reasonable cause to search Smith's residence and the Samsung smartphone. Smith failed a polygraph test after being "asked about possessing any unauthorized electronic devices" in violation of condition 24. Gill had previously read Dr. Covell's report and thus knew about Smith's "history of use of internet technology to pursue casual sexual activity, view sexually abusive/exploitative images featuring minors, and to sexually chat with/meet adolescent minors." Based on Smith's failed polygraph examination, Gill suspected Smith "was possibly communicating with minors, looking up victims[] [and] child pornography" in violation of his sentencing conditions. Gill testified that based on his training and experience, "[e]ach time we have ever done phone searches or home searches or any of that sort, if we do find a secondary cell phone that we're unaware of, it's always resulted in something on there that they're not supposed to have." Additionally, condition 21 (relating to internet access) "permitted [Smith's CCO] to make random searches of any computer, phone, or computer-related device to which the defendant has access to monitor compliance with this condition." This condition, when combined with Gill's knowledge that Smith may be in possession of an unauthorized smartphone, provided the CCOs with lawful authority to search Smith's residence and the Samsung smartphone, which they believed had a nexus with the suspected SSOSA violation. Thus, the trial court did not err in admitting evidence of the Samsung smartphone and its contents.

C.    Revocation of Smith's SSOSA

Smith next argues the trial court abused its discretion in revoking his SSOSA. We disagree.

"A SSOSA sentence may be revoked at any time if there is sufficient proof to reasonably satisfy the court that the offender has violated a condition of the suspended sentence or failed to make satisfactory progress in treatment." *McCormick*, 166 Wn.2d at 705. "'Revocation of a suspended sentence due to violations rests within the discretion of the trial court and will not be disturbed absent an abuse of discretion.'" *State v. Miller*, 180 Wn. App. 413, 416-17, 325 P.3d 230 (2014) (quoting *McCormick*, 166 Wn.2d at 705-06). A trial court abuses its discretion where its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *Id.* A trial court does not abuse its discretion in revoking a suspended sentence where the offender's violation of a condition "presented a risk to the safety or welfare of society." *See McCormick*, 166 Wn.2d at 706 (affirming revocation of SSOSA where offender violated condition prohibiting him from frequenting areas where children are known to congregate); *see also Miller*, 180 Wn. App. at 421 (affirming revocation of SSOSA where offender violated condition requiring him to timely commence sexual deviancy treatment).

The trial court here was presented with ample evidence supporting the State's alleged violations. Gill's testimony at the revocation hearing and the supporting documentation accompanying his notice of violation established that Smith possessed and accessed the Samsung smartphone without obtaining prior

authorization from his CCO in violation of condition 21 and/or condition 24, viewed pornography (including child pornography) in violation of condition 19, and communicated with minor children in a "sexual . . . nature" in violation of condition 22. Smith himself admitted to Gill that the Samsung smartphone contained "lewd images" and "child pornography" that he obtained on the "dark web." The trial court correctly observed that Smith's actions demonstrated "deceptiveness with regard to engaging with the CCOs and also the treatment providers" and noted, "if an individual is not able . . . to be honest with regard to their violations or their behaviors, then they're not going to be able to move forward with their treatment." Additionally, Smith's CCO and his sex offender treatment provider both recommended that the trial court revoke his SSOSA due to the severity of his violations. Given this evidence that Smith violated several conditions of his SSOSA in a manner that presented a risk to the safety or welfare of society, the trial court did not abuse its discretion in revoking Smith's SSOSA.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. *See* RCW 2.06.040.

Unpublished Text Follows

D.    <u>Scrivener's error</u>

Smith argues substantial evidence does not support the trial court's finding relating to the second violation (that on or before December 12, 2023, Smith violated the terms of his SSOSA by "possessing/viewing pornographic material via iPhone smartphone, over 100 images of multiple minor aged girls fully exposing

their bare vagina and breast[s]" because "[t]here was no testimony related to an iPhone smartphone. . . . Nor was an iPhone smartphone mentioned in any of the affidavits presented with the revocation petition." In response, the State concedes there is no evidence related to an "iPhone," but it argues this is a "scrivener's error" and we should "remand to the revocation court to correct this error" because "the revocation court intended [for the second violation] to relate to the same phone [the Samsung smartphone] as the other violations." Smith appears to have abandoned this argument in his reply brief, which does not address this argument further or respond to the State's contention that this error was the result of a scrivener's error. Having carefully reviewed the record and both parties' arguments, we agree this is an apparent scrivener's error. The remedy for such an error is a remand to the trial court to correct the error. *In re Pers. Restraint of Mayer*, 128 Wn. App. 694, 701-02, 117 P.3d 353 (2005). We remand for the trial court to do so here.[4]

E.      Legal Financial Obligations

Smith next argues that due to his indigency at the time of sentencing he is "entitled to relief" from a $500 Victim Penalty Assessment (VPA) imposed pursuant to former RCW 7.68.035 (2018) and a $100 DNA fee imposed pursuant to former RCW 43.43.7501 (2018). The State counters that Smith "is not entitled to a refund"

---

[4] Additionally, even if we accepted Smith's substantial evidence argument, that would not change our holding that the trial court did not err in revoking Smith's SSOA. Given that substantial evidence supports the trial court's findings regarding the four remaining violations of the SSOSA and the gravity of those violations (including the fourth violation that also relates to viewing or possessing pornographic materials), we are certain the trial court would have appropriately exercised its discretion to revoke Smith's SSOSA based on the those violations.

25

of these fees in this appeal because he is on direct appeal from the order revoking his SSOSA entered in 2024, not from his original judgment and sentence entered in 2021.

We agree with the State. As Smith acknowledges, the statutes regarding the VPA and the DNA collection fee that were in effect when he was sentenced on October 6, 2021 required sentencing courts to impose these fees regardless of the defendant's indigency. *See* former RCW 7.68.035 (2018); former RCW 43.43.7501 (2018). Although the legislature subsequently amended these statutes such that sentencing courts are now required to waive these fees when sentencing indigent defendants, those amendments apply retroactively only to cases pending on direct appeal. *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). Smith is not on direct appeal from his 2021 judgment and sentence because, although he designated that order in his notice of appeal in this case, he did not seek direct review within 30 days of entry of that order as required by RAP 5.2(a) and has, therefore, waived direct review of that order. Accordingly, we decline Smith's request to remand to strike the VPA and DNA collection fees from his judgment and sentence. Smith may instead file a motion in the court below seeking a waiver of these fees under RCW 7.68.035(5) and RCW 43.43.7541(2).

For this same reason, we decline Smith's request to remand to strike the $200 criminal filing fee imposed with his 2021 judgment and sentence. While Smith correctly observes that former RCW 36.18.020(h) prohibited a sentencing court from imposing this filing fee on indigent defendants, Smith cites no authority allowing us to remand to strike this fee where the defendant is not on direct appeal

26

from their judgment and sentence but, instead, is on direct appeal from a subsequent order revoking their SSOSA. *See State v. Loos*, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) ("When a party provides no citation to support an argument, this court will assume that counsel, after diligent search, has found none."). As with the VPA and DNA collection fees, the proper remedy under the current version of the filing fee statute is for Smith to file a motion in the trial court seeking to waive or reduce this fee due to his indigency. *See* RCW 36.18.020(2)(h).

F.    Statement of additional grounds

Smith's statement of additional grounds (SAG) is 42 pages in length and contains many intertwined arguments that are not clearly delineated. Several of Smith's arguments in his SAG mirror those that we have already rejected above. Having carefully reviewed each alleged error, we reject the arguments raised in Smith's SAG for the reasons discussed below.

Smith first argues that several additional sentencing conditions are "unconstitutional due to their vagueness and/or overbreadth, invalid on their face, and/or in excess of the sentencing Court's authority."[5] Smith's challenges to these

---

[5] In addition to conditions 21 and 24 (discussed in section II.A above), Smith challenges condition 2 prohibiting him from contacting the victim of his crime (his daughter); condition 8 requiring him to participate in urinalysis, breathalyzer, and polygraph examinations as directed by his CCO; condition 12 requiring him to consent to DOC home visits to monitor his compliance with his supervision; condition 14 prohibiting him from "initiating or prolong[ing] contact with minor children without the presence of an adult who is knowledgeable of the offense and has been approved by the supervising [CCO]," condition 16 requiring him to "[s]tay out of areas where children's activities regularly occur or are occurring;" condition 17 prohibiting him from "dat[ing] women nor form[ing] relationships with families who have minor children," requiring him to "[d]isclose sex offender status prior to any sexual contact," and prohibiting him from engaging in "[s]exual contact in a relationship" without approval from his CCO or treatment provider; and condition 20 prohibiting him from

sentencing conditions fail for the same reasons discussed in section II.A above, namely that Smith invited these alleged constitutional errors by relying on them to persuade the sentencing court into granting a SSOSA. More fundamentally, Smith's challenges to these other conditions are unpersuasive because they did not factor into the trial court's decision to revoke his SSOSA, which was based on Smith's violations of the sentencing conditions prohibiting him from viewing sexually explicit material and communicating with minor children over the internet.

Smith also argues the trial court should have suppressed the results of his failed polygraph examination because that evidence was obtained in violation of article 1, section 7 of the Washington Constitution. We decline to consider this argument because Smith has waived any challenge to the admission of the polygraph evidence due to his failure to raise such an objection below. *See* RAP 2.5(a). Smith's argument also fails on the merits, as our Supreme Court has acknowledged that sentencing courts may impose monitoring requirements such as polygraph testing when imposing a SSOSA. *See State v. Riles*, 135 Wn.2d 326, 340 n.40, 957 P.2d 655 (1998).

Next, Smith argues condition 24 did not prohibit him from possessing the Samsung smartphone because the term "computer" does not include smartphones but instead only "refers to desktop or laptop computers." A "computer" is "a programmable electronic device that can store, retrieve, and process data." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 468 (2002). A smartphone, such

---

"frequent[ing] establishments whose primary business pertains to sexually explicit or erotic material."

as the Samsung that Smith used to access the internet to view pornography and communicate with minor children, satisfies this definition and is encompassed within condition 24. That is especially true when reading the term "computer" in the context of Smith's other sentencing conditions, Dr. Covell's report, and the sentencing court's statements at the sentencing hearing in October 2021.

Smith also argues the State committed "flagrant misconduct . . . , a serious Brady violation, and certainly a denial of due process" by not introducing the contents of the Samsung smartphone into evidence and, instead, relying on Gill's testimony regarding those contents. Similarly, Smith argues the trial court erred by relying on the reports submitted by the two other CCOs without requiring them to testify at the hearing and be subjected to cross examination by Smith. These arguments are unconvincing in light of our Supreme Court's holding in *State v. Dahl* that "the due process rights afforded at a revocation hearing are not the same as those afforded at the time of trial" because "[a]n offender facing revocation of a suspended sentence has only minimal due process rights." 139 Wn.2d 678, 683, 990 P.2d 396 (1999). Relevant here, this minimal due process entails "disclosure to the parolee of the evidence against him" and "the right to confront and cross-examine witnesses (unless there is good cause for not allowing confrontation)." *Id.* at 683. Moreover, "[c]ourts have limited the right to confrontation afforded during revocation proceedings by admitting substitutes for live testimony, such as reports, affidavits and documentary evidence," and this evidence may be considered if "there is good cause to forgo live testimony." *Id.* at 686. "Good cause is defined in terms of 'difficulty and expense of procuring witnesses in combination

with demonstrably reliable or clearly reliable evidence.'" *Id.* (internal quotation marks omitted) (quoting *State v. Nelson*, 103 Wn.2d 760, 765, 697 P.2d 579 (1985)). Ultimately, "[t]hese requirements exist to ensure that the finding of a violation of a term of a suspended sentence will be based upon verified facts." *Id.* at 683.

Here, the trial court complied with Smith's due process rights by ensuring the violations of his SSOSA terms were based upon verified facts. Gill testified at the revocation hearing to his personal observations regarding the search of Smith's residence and the Samsung smartphone on December 12, 2023, and he was cross examined by Smith's counsel. Gill testified without objection that Smith himself made incriminating statements that the Samsung smartphone contained "lewd images" and "child pornography" that he obtained on the "dark web." Because this evidence was demonstrably reliable, Smith was not entitled to also confront and cross examine the other CCOs who accompanied Gill during these searches. Moreover, the prosecutor explained that the State could not provide a "completed report" of the content discovered on the Samsung smartphone because, at the time of the revocation hearing, police had not yet completed their forensic investigation of the smartphone. On this record, the trial court proceedings did not violate Smith's due process rights.

Smith further contends the trial court was biased against him because it misrepresented evidence in favor of the State, "argued for the State," and "blind[ly] accept[ed] . . . the prosecutor's excuses for the missing evidence." We have

carefully reviewed the record and conclude Smith's claims of impartiality by the trial court are unfounded.

Lastly, Smith makes a blanket argument that "any errors which I waived the right to appeal by lack of objection were ineffective assistance on my trial counsel's part, for not doing so." We decline to consider this conclusory argument because it "does not inform the court of the nature and occurrence of the alleged errors" as required by RAP 10.10(c).

Affirmed and remanded.

_Feldman, J._

WE CONCUR:

_Díaz, J._                                    _Smith, J._