[No. 80755-8.   En Banc.]
Argued February 26, 2009.     Decided December 3, 2009.

THE STATE OF WASHINGTON, *Respondent*, v. TERRY LEE WINTERSTEIN, *Petitioner*.

622

*Anne M. Cruser* (of *Law Office of Anne Cruser*), for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *James B. Smith, Deputy*, for respondent.

¶1 STEPHENS, J. — Petitioner Terry Lee Winterstein was convicted of unlawful manufacture of methamphetamine with evidence discovered through a warrantless search of his residence by his probation officer. During a routine examination of the trial exhibits to be given to the jury, Winterstein's counsel discovered evidence that Winterstein changed his address with the Department of Corrections at least three weeks prior to the search. After he was convicted, Winterstein filed a motion for relief from judgment, arguing that the evidence gathered as a result of the warrantless search should be suppressed because his probation officer did not have the authority of law to search a house that was not Winterstein's documented residence. After holding a posttrial suppression hearing, the trial court denied the motion.

¶2 The Court of Appeals affirmed. *State v. Winterstein*, 140 Wn. App. 676, 166 P.3d 1242 (2007). It held that the probation officer had authority to search the residence because he had reasonable suspicion under the *Terry*[1] "specific and articulable facts" standard to believe it was Winterstein's residence. In the alternative, the Court of Appeals held that notwithstanding the illegal search, the evidence was admissible under the inevitable discovery doctrine. This case requires us to consider what standard a probation officer will be held to in determining a probationer's residence in order to justify a warrantless search of that residence. We hold that a probation officer must have probable cause to believe that a probationer resides at a particular residence before searching that residence. Additionally, we hold that the inevitable discovery doctrine is incompatible with article I, section 7 of the Washington State Constitution. We reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶3 Winterstein received community supervision after pleading guilty to a gross misdemeanor in September 2002 and was assigned to Community Corrections Officer (CCO) Kristopher Rongen. As a condition of supervision, Winterstein signed a Department of Corrections (DOC) document acknowledging that he was subject to a search of his residence or other personal effects if the DOC had reasonable cause to suspect a violation of those terms. Winterstein initially reported his address as 646 Englert Road, Woodlawn, Washington.

¶4 Rongen required Winterstein to report twice per month. Even though the terms of his supervision required only notice to the DOC of a change of address, Rongen testified that he additionally required his supervisees to seek his permission before moving. In spite of this require-

---

[1] *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

ment, Rongen testified that offenders are allowed to use the computer kiosks in the DOC offices to give notice of a change of address. All CCOs can access the information entered at the kiosks from a database on their computers, as well as information from the offender based tracking system (OBTS).

## The Warrantless Search

¶5 Due to Winterstein's failure to report on January 15, 2003 and previous failed drug tests, Rongen planned to do a home visit. On February 5, 2003, Rongen received a tip from the Clark-Skamania Drug Task Force (Task Force) that there was a possible methamphetamine lab at 646 Englert Road. The next day, Rongen went to 646 Englert Road, along with two other DOC officers and five to six officers from two area joint drug task forces. Rongen did not check the kiosk database to confirm Winterstein's address prior to the visit, though he did check OBTS.

¶6 Upon arriving at the house, Rongen knocked on the front door and announced himself. An unidentified voice told him to come in. Rongen and the other officers entered and immediately walked through the house, directing all the occupants into the living room. Rongen testified that while searching the house for people, he looked into two bedrooms, neither of which was Winterstein's, and observed methamphetamine paraphernalia.

¶7 After directing people to the living room, Rongen asked Sunshine O'Connor, a former resident of 646 Englert Road and also Winterstein's girl friend, where Winterstein was and if he still lived at the house. O'Connor replied that Winterstein still lived at the house, but he was not there at the time.

¶8 Once everyone was gathered in the living room, one of the other officers explained their purpose and the officers conducted a search of the premises. There is no evidence that Rongen or any of the officers ever asked for or received permission from any of the occupants to search the house.

During the search, Rongen did not see anything incriminating in the bedroom he believed to be Winterstein's.

¶9 Following the search, Rongen notified the Task Force officers of the methamphetamine paraphernalia he observed in two of the bedrooms, and an officer from the Task Force obtained a warrant. Task Force officers subsequently searched 646 Englert Road and confiscated the methamphetamine paraphernalia. They also searched an adjacent motor home marked with "646½" at the side of the door. An officer testified that the motor home was filled with boxes and that it did not appear that anyone lived there. The officer did concede that it was possible for someone to live in the motor home. No contraband was found in it.

## Trial and Postconviction Motions

¶10 Based on the evidence obtained from the search, Winterstein was charged with unlawful manufacture of methamphetamine. At some point during trial proceedings, it came to light that Winterstein had changed his address to 646½ Englert Road using the kiosk in the DOC office, though there was a dispute about when the address change occurred. During discovery, the defense received a report from Rongen stating DOC records indicated that Winterstein did not change his address until the day of the search. Based on this information, Winterstein's counsel did not pursue a motion to suppress the evidence gathered as a result of Rongen's search.

¶11 After the close of evidence at trial and during a routine examination of the trial exhibits to be submitted to the jury, Winterstein's counsel discovered a DOC billing statement addressed to Winterstein at 646½ Englert Road. The statement was dated January 13, 2003, three weeks before the search. This document had not been turned over to the defense during discovery.

¶12 Winterstein was convicted on December 23, 2004. Winterstein moved for relief from judgment under CrR 7.8 based on newly discovered evidence, the misrepresentation

of an adverse party, and a violation of his constitutional right to be free from unreasonable searches and seizures. Winterstein also moved for a new trial under CrR 7.5 based on trial errors not at issue on appeal. Because the newly discovered evidence related to a suppression issue, all parties agreed that a suppression hearing was appropriate. Further, the State conceded that if Winterstein prevailed at the suppression hearing, then the court should grant him a new trial.

¶13 Following a suppression hearing that began at 4:15 p.m. and ran until 8:30 p.m., the trial court refused to suppress the evidence seized as a result of Rongen's warrantless search. The court found that Winterstein had properly effected his address change and that the DOC had notice of the change at least by January 13, 2003. However, the court also found that the address change to 646½ Englert Road was a ruse and that Winterstein actually lived at 646 Englert Road. Concluding that Rongen acted in good faith in performing the search at the defendant's actual address, the court upheld the validity of the search.

## Appeal

¶14 Winterstein appealed, arguing that Rongen lacked legal authority to search 646 Englert Road in light of the address change. At oral argument, the Court of Appeals sua sponte brought up the issue of inevitable discovery. Affirming Winterstein's conviction in a partially published opinion, the court explained that under the *Terry* standard, the search of 646 Englert Road was lawful because CCO Rongen had a reasonable belief that Winterstein resided there. *Winterstein*, 140 Wn. App. at 692. The court further held that even if the search was not lawful, the evidence was admissible under the doctrine of inevitable discovery, citing *State v. Warner*, 125 Wn.2d 876, 889, 889 P.2d 479 (1995). *Winterstein*, 140 Wn. App. at 693. Winterstein petitioned this court for review, which we granted. *State v. Winterstein*, 163 Wn.2d 1033, 187 P.3d 269 (2008).

## ANALYSIS

■■ ¶15 We review conclusions of law relating to the suppression of evidence de novo. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). We review findings of fact for substantial evidence. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

### Search of the Residence under Article I, Section 7

¶16 Winterstein argues that the Court of Appeals erred in applying the *Terry* analysis to decide whether Rongen had the authority to search 646 Englert Road. Implicitly, Winterstein argues that authority of law requires something more than the *Terry* reasonable or well-founded suspicion standard, necessarily probable cause.

■■ ¶17 Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under article I, section 7, the requisite "authority of law" is generally a search warrant. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005) (citing *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999)). Warrantless searches are per se unreasonable unless justified by a recognized exception. *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)). The narrow exceptions to the warrant requirement are " 'jealously and carefully drawn.' " *Id.* (internal quotation marks omitted) (quoting *Houser*, 95 Wn.2d at 149).

■ ¶18 Both parties agree that because Winterstein is under community supervision, he has a lesser expectation of privacy and may be searched on the basis of a well-founded or reasonable suspicion of a probation violation. However, even with this lesser expectation of privacy, the probation officer's authority to search a residence extends only to the probationer's residence: "[i]f there is reasonable cause to believe that an offender has violated a condition or

requirement of the sentence, an offender may be required to submit to a search and seizure of the *offender's* person, residence, automobile, or other personal property." Former RCW 9.94A.631 (1984) (emphasis added). We have never decided whether it is enough that a probation officer reasonably believes a probationer lives at a certain residence prior to performing a search of that residence.

¶19 The Court of Appeals for the Ninth Circuit has addressed this issue. In *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005), that court held that before conducting a warrantless search of a parolee's residence, law enforcement officials "must have probable cause to believe that they are *at* the parolee's residence." The court noted that the probable cause requirement is important to protect the interests of third parties because it " 'seek[s] to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.' " *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)).

¶20 Similarly, we have recognized that probable cause is the minimum standard for determining whether a residence belongs to the subject of an arrest warrant. *State v. Hatchie*, 161 Wn.2d 390, 392, 166 P.3d 698 (2007). In *Hatchie*, the police had a misdemeanor arrest warrant for an unrelated person when officers entered Hatchie's residence believing the suspect lived there. *Id.* We held that under article I, section 7, the police have the limited power to enter a residence for an arrest so long as the entry is not pretextual, the subject of the arrest warrant is actually present, and the police have probable cause to believe that the subject of the arrest warrant is a resident of the home to be entered. *Id.* at 392-93. We explained the probable cause requirement is a protection of the third parties' privacy interests, which come into play when officers enter the homes of nonsuspects:

> "[t]he third party's privacy interest in being free from unreasonable invasion of his home is distinguishable from the suspect's interest in avoiding unreasonable seizure. It is the

rights of the homeowner that the issuing magistrate must balance with the necessity for the search. Unless the third party's interests are considered, the search is no more reasonable than if no warrant had been issued."

*Id.* at 402-03 (alteration in original) (quoting *State v. Anderson*, 105 Wn. App. 223, 232, 19 P.3d 1094 (2001)). We concluded that if the police did not have probable cause to believe, based on objective evidence, that the subject of the arrest warrant was a resident of the home they wished to enter, the arrest warrant could not authorize them to enter. *Id.* at 403.

¶21 As both the *Motley* and *Hatchie* opinions recognized, protection of third party privacy interests is implicated when there is a question about the residence of a person who is the target of a search. Even though probationers have a lessened expectation of privacy, third parties not under the control of the DOC do not. Anytime a question arises about the actual residence of a probationer, therefore, third party privacy interests must be considered. This is particularly important where, as here, DOC asserts the right to search a probationer's residence even when he is not home.[2]

¶22 We follow the reasoning of *Hatchie* and *Motley* and hold that probation officers are required to have probable cause to believe that their probationers live at the residences they seek to search. In this context, probable cause exists when an officer has information that would lead a person of reasonable caution to believe that the probationer lives at the place to be searched. The information known to the officer must be reasonably trustworthy. Only facts and knowledge available to the officer at the time of the search should be considered. *See State v. Mance*, 82 Wn. App. 539, 541-42, 918 P.2d 527 (1996) (quoting *State v. Fore*, 56 Wn.

---

[2] Winterstein has not challenged the search on the ground that he was not present when it was conducted. Accordingly, we leave for another day the question of whether RCW 9.94A.631(1), the statute upon which DOC relies as authority to search a probationer's "person, residence, automobile, or other personal property," allows a warrantless home search when the probationer is not at home.

App. 339, 343, 783 P.2d 626 (1989)). Because the court below did not apply the proper probable cause standard, we remand for further proceedings to determine whether Rongen had probable cause to believe Winterstein resided at 646 Englert Road at the time of the search.

## Inevitable Discovery

¶23 Because we remand for a new suppression hearing, a discussion of the inevitable discovery doctrine is necessary.[3] As noted, the Court of Appeals at oral argument raised the issue of inevitable discovery sua sponte. Taking its cue from the Court of Appeals, the State argues that we should allow the evidence obtained during the search under the inevitable discovery doctrine, which it asserts is well established in Washington. In support, the State analogizes the inevitable discovery exception to the "independent source" doctrine recognized in *State v. Coates*, 107 Wn.2d 882, 735 P.2d 64 (1987) and *State v. Gaines*, 154 Wn.2d 711, 116 P.3d 993 (2005).

¶24 Winterstein counters that this court has never recognized inevitable discovery as an exception to the exclusionary rule under article I, section 7, and we should not do so now. He argues that we have consistently held article I, section 7 protects an individual's right to privacy and that when a violation occurs, the exclusion of the evidence must follow.

¶25 It is well-established that article I, section 7 provides greater protection of privacy rights than the Fourth Amendment. *Morse*, 156 Wn.2d at 10. It differs from its federal counterpart in that article I, section 7 "clearly recognizes an individual's right to privacy with no express limitations." *State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061

---

[3] The concurrence describes our discussion of the inevitable discovery doctrine as dictum. It is not. Because we remand for a new suppression hearing, issues affecting the admissibility of the challenged evidence remain. Resolution of this case requires us to decide whether, in the absence of probable cause, the challenged evidence is nonetheless admissible under the inevitable discovery doctrine.

(1982). Based on the intent of the framers of the Washington Constitution, we have held that the choice of their language "mandate[s] that the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy." *Id.* Because the intent was to protect personal rights rather than curb government actions, we recognized that "whenever the right is unreasonably violated, the remedy must follow." *Id.*; *see also State v. Barker*, 143 Wn.2d 915, 922, 25 P.3d 423 (2001); *Ladson*, 138 Wn.2d at 359; *In re Pers. Restraint of Maxfield*, 133 Wn.2d 332, 343, 945 P.2d 196 (1997); *State v. Young*, 123 Wn.2d 173, 196, 867 P.2d 593 (1994); *State v. Boland*, 115 Wn.2d 571, 582, 800 P.2d 1112 (1990). The constitutionally mandated exclusionary rule provides a remedy for individuals whose rights have been violated and protects the integrity of the judicial system by not tainting the proceedings with illegally obtained evidence. *Ladson*, 138 Wn.2d at 359-60 (citing *State v. Crawley*, 61 Wn. App. 29, 34-35, 808 P.2d 773 (1991)). Because of textual differences, state action may be valid under the Fourth Amendment but violate article I, section 7. *Hatchie*, 161 Wn.2d at 396.

¶26 It is true that we have carved out some limited exceptions to the exclusionary rule under article I, section 7. For example, in *State v. Bonds*, 98 Wn.2d 1, 11, 14, 653 P.2d 1024 (1982), we did not exclude evidence obtained through illegal but not unconstitutional means that did not violate Washington law. In that case, the defendant was arrested in Oregon by Vancouver police officers in violation of Oregon law. *Id.* at 7. As a result of the illegal Oregon arrest, the defendant confessed. *Id.* at 6. In holding the confession was properly admitted in a Washington prosecution, we held that the exclusionary rule was not necessary under these circumstances. *Id.* at 14. Because there were no constitutional implications, we proceeded to balance the costs and benefits of admitting the confession, concluding that the benefits outweighed the costs. *Id.* at 10-15. However, we specifically stated that the balancing of interests should not be carried out when evidence is obtained in violation of a defendant's constitutional rights:

By balancing the competing costs and benefits in this case, we do not intend to suggest that such a balancing should be carried out whenever the operation of the exclusionary rule is an issue. When evidence is obtained in violation of the defendant's constitutional immunity from unreasonable searches and seizures, there is no need to balance the particular circumstances and interests involved. Evidence obtained as a result of an unreasonable search or seizure must be suppressed.

*Id.* at 10-11 (citation omitted).

¶27 Because the circumstances in *Bonds* were unique, that case does not support recognizing broad exceptions to the exclusionary rule. Moreover, subsequently in *Boland,* we emphasized that *Bonds* was the exceptional case, and the general rule is that "violation of a constitutional immunity automatically implies exclusion of the evidence seized." *Boland,* 115 Wn.2d at 582; *see also White,* 97 Wn.2d at 110 (noting that "whenever the right is unreasonably violated, the remedy must follow").

¶28 In *Coates* and *Gaines,* we applied the independent source doctrine as an exception to the exclusionary rule. In *Coates,* the State obtained evidence based on a search warrant affidavit that included illegally obtained information. 107 Wn.2d at 886. We held that the search warrant could still be valid if, after excluding the illegally obtained information, the remaining information in the search warrant independently established probable cause. *Id.* at 888. Under this test, the evidence obtained based on the search warrant was properly admitted. *Id.* at 889.

¶29 Similarly, in *Gaines,* the State performed an illegal warrantless search of the trunk of the defendant's car, during which the officers saw a weapon. 154 Wn.2d at 714. Later, the police sought a search warrant for the defendant's trunk, which referenced the officer's observation of the weapon, as well as other evidence to establish probable cause. *Id.* at 714-15. Relying on our decision in *Coates,* we held the search warrant was valid because probable cause existed even after excluding the illegally obtained information; thus, the evidence seized as a result of the search

warrant was properly admitted. *Gaines*, 154 Wn.2d at 718-20. We explained that exclusion of only the illegally obtained information was sufficient to respect both the privacy interests of the individual and the State's interest in prosecuting criminal activity. *Id.* at 720. Under the independent source doctrine, the State is in no better or worse position as a result of the illegal search. *Id.*

¶30 We do not read *Coates* and *Gaines* expansively. The independent source doctrine is much different from the inevitable discovery doctrine. The independent source doctrine recognizes that probable cause may exist based on legally obtained evidence; the tainted evidence, however, is suppressed. This is consistent with the mandate of *White* and *Boland* and does not suggest any balancing of interests as a precondition to the exclusion of unlawfully obtained evidence. As in *Bonds*, the balancing of interests under the independent source doctrine becomes relevant only after the tainted evidence is disregarded. *See Coates*, 107 Wn.2d at 889; *Gaines*, 154 Wn.2d at 720.

¶31 In contrast, the inevitable discovery doctrine is necessarily speculative and does not disregard illegally obtained evidence. The State seeks to admit evidence that it claims the police would have discovered notwithstanding the violation of the defendant's constitutional rights. For example, the federal doctrine allows admission of illegally obtained evidence if the State can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). There is no requirement of good faith on the part of the police. *Id.* at 445.

¶32 The Washington Court of Appeals has adopted the federal doctrine with refinements. It has held that the State must prove by a preponderance of the evidence that (1) the police did not act unreasonably or to accelerate discovery of the evidence, (2) police used proper and predictable procedures, and (3) those procedures would have inevitably led to discovery. *State v. Avila-Avina*, 99 Wn. App. 9, 17, 991 P.2d

720 (2000); *State v. Reyes*, 98 Wn. App. 923, 930, 933, 993 P.2d 921 (2000); *State v. Richman*, 85 Wn. App. 568, 577, 933 P.2d 1088 (1997).

¶33 The reasoning of these Court of Appeals cases is flawed, however, because it relies on the federal rationale for the inevitable discovery doctrine. For example, instead of emphasizing the individual privacy rights guaranteed in article I, section 7, the opinion in *Richman* cites *Nix* and describes the rationale for the exclusionary rule as "deterrence of unlawful police conduct." *Richman*, 85 Wn. App. at 575. There is no question that under federal law, the inevitable discovery doctrine is applicable in certain cases. However, the federal analysis is at odds with the plain language of article I, section 7, which we have emphasized guarantees privacy rights with no express limitations. *See Ladson*, 138 Wn.2d at 348; *White*, 97 Wn.2d at 110; *Boland*, 115 Wn.2d at 582 (quoting *White*, 97 Wn.2d at 110).

¶34 Further, the few courts that have allowed an inevitable discovery exception (including the court below) relied in error on *Warner* for the proposition that the inevitable discovery doctrine comports with our state constitution. *Warner* involved the Fifth Amendment and exceptions to suppression of evidence gathered in violation of that amendment. 125 Wn.2d at 888-89. There was no discussion of any state law, much less an exception to the exclusionary rule under article I, section 7. In short, *Warner* was solely a federal law analysis.

¶35 After *Warner*, we recognized that there is no established inevitable discovery exception under article I, section 7. *State v. O'Neill*, 148 Wn.2d 564, 592 n.11, 62 P.3d 489 (2003). We further noted our disapproval of the inevitable discovery doctrine under the circumstances of that case. In *O'Neill*, an officer, after lawfully detaining the defendant, performed a warrantless search of the defendant's car without consent. *Id.* at 588-91. The State argued that the officer would have inevitably discovered the evidence upon lawfully arresting the defendant and performing a search incident to arrest. *Id.* at 591-92. In suppressing the evi-

dence discovered during the search, we held that the inevitable discovery doctrine was inapplicable. *Id.* at 592. We reasoned that admitting evidence under the inevitable discovery doctrine would leave "no incentive for the State to comply with article I, section 7's requirement that the arrest precede the search." *Id.*

¶36 Consistent with this precedent, we reject the inevitable discovery doctrine because it is incompatible with the nearly categorical exclusionary rule under article I, section 7.

## CONCLUSION

¶37 We hold that the Court of Appeals erred in applying the *Terry* analysis to determine whether a probation officer believes a probationer lives at a residence to be searched. Probable cause is the appropriate standard. Additionally, we reject the State's argument that the inevitable discovery exception to the exclusionary rule applies, as this exception does not comport with article I, section 7 of the Washington Constitution. We reverse and remand to the trial court for a new suppression hearing with instructions that the probable cause standard applies and the inevitable discovery doctrine does not.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, and CHAMBERS, JJ., concur.

¶38 J.M. JOHNSON, J. (concurring) — I agree with this court's decision to reverse and remand this case for further proceedings. I am confident that the court below will find that Community Corrections Officer Kristopher Rongen had probable cause to search 646 Englert Road, Woodlawn, Washington, the residence of record of Terry Lee Winterstein.

### THE SEARCH

¶39 "Probable cause" exists if a reasonable person would believe that a specific condition is more likely than not true.

Whether probable cause exists is necessarily a fact-based inquiry. Three specific facts in this case show that a reasonable person would have believed that Winterstein likely resided at 646 Englert Road. Probable cause thus existed, and Officer Rongen had authority of law to search Winterstein's true residence.

¶40 First, Winterstein identified 646 Englert Road as his residence when he gave Officer Rongen a guided tour of the premises, including Winterstein's bedroom, three months prior to the search. At this point, Rongen knew (beyond probable cause) that 646 Englert Road was Winterstein's residence.

¶41 Second, Officer Rongen communicated to Winterstein that Winterstein had to seek Rongen's approval before changing his residence. Winterstein never protested this requirement. Nor did Winterstein ever seek approval or notify Rongen directly in any way that he was moving into a motor home spray-painted with "646½" (a fictional address), located on the same property as 646 Englert Road.[4] Rongen had an unrebutted expectation that he would be notified if a condition changed, and Winterstein did not fulfill this expected requirement of seeking approval or even giving Rongen direct notice. A reasonable person in these circumstances would believe Winterstein's address had likely continued to be 646 Englert Road, so Rongen had probable cause.

¶42 Third, Officer Rongen verified Winterstein's address before conducting his search. Before entering 646 Englert Road, Rongen checked the offender based tracking system, one of two Department of Corrections databases that contained probationers' personal information, and confirmed Winterstein's address.[5] If this court held that an officer was required to check yet another database to verify an official

---

[4] The motor home was so filled with boxes that Detective Timothy Watson testified that it did not appear that anyone could live there. Verbatim Report of Proceedings (VRP) (June 28, 2005) at 248.

[5] Officer Rongen testified that he did not regularly use the other database. VRP (June 28, 2005) at 127-28.

database's information and Rongen's firsthand knowledge, I would dissent.

¶43 Winterstein identified 646 Englert Road as his residence to Officer Rongen in person. Rongen informed Winterstein he expected Winterstein to seek approval before changing his address. Winterstein never argued or disagreed with that condition, so Rongen's reliance on that condition as a basis of believing Winterstein never changed addresses is completely reasonable. Rongen verified Winterstein's address as 646 Englert Road before searching that location. Given these facts, I fail to see how any court could help but find that a reasonable person would believe it more likely than not that Winterstein still resided at 646 Englert Road. Rongen thus had authority of law to search that location.

¶44 Fortunately, the legislature has recently provided additional guidance to the issue of probationer residence requirements. RCW 9.94A.703(2) states, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . (e) Obtain prior approval of the department for the offender's residence location and living arrangements." Though this legislation was passed after Winterstein was released on community custody and thus does not apply in this case, the legislature has signaled that it will not allow future probationers to play games with the criminal justice system, such as pretending to live in an uninhabitable motor home with a spray-painted, fictional address.

INEVITABLE DISCOVERY

¶45 The majority's analysis of the inevitable discovery doctrine is an unnecessary discussion and therefore dictum. I further note that this court has upheld the inevitable discovery doctrine in *State v. Warner*, 125 Wn.2d 876, 889, 889 P.2d 479 (1995). It is a necessary conclusion of *Warner*, and thus binding precedent on this court, that in at least some cases, the Washington Constitution is compatible

with the inevitable discovery doctrine, though perhaps not to the full extent of the Fourth Amendment to the United States Constitution.

¶46 At any rate, the issue is not properly addressable at this time.

CONCLUSION

¶47 I concur in remanding to the trial court in order for that court to find authority of law for probation officers' supervisory investigations at the residences of offenders who have been released before completing their maximum sentence. Such early release is an option increasingly utilized for most convicted offenders. Supervision is necessary to minimize reoffending and known residence is key to such supervision. The public will not understand, and the legislature did not authorize, the game playing by probationers such as appears on these facts.

OWENS and FAIRHURST, JJ., concur with J.M. JOHNSON, J.

Reconsideredation denied March 3, 2010.