FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 31, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 31, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | |
| | ) | No. 103136-0 |
| Petitioner, | ) | |
| | ) | |
| KYLE W. EVANS, | ) | Filed: July 31, 2025 |
| | ) | |
| Respondent | ) | |
| | ) | |

YU, J. — This case comes to us on direct, interlocutory review of a superior court order denying the State's motion to permit the administrative booking of an out-of-custody pretrial defendant, Kyle Evans, for the purpose of taking his fingerprints and other identifying information. At issue in this case is whether King County's administrative booking process, which requires patting down, handcuffing, and detaining out-of-custody defendants (sometimes in a jail cell) to collect their fingerprints and other information violates article I, section 7 of the Washington Constitution. RCW 10.98.050 authorizes the collection of fingerprints and other identifying information from any person alleged to have committed a

felony. However, the statute is silent as to the method for how this information is to be collected and when or where the collection should take place. Different trial court judges in the two divisions of King County Superior Court (Seattle and Kent) have reached opposite conclusions on this issue. Although the underlying issue in this case originates from the King County Superior Court's Maleng Regional Justice Center (MRJC) in Kent, our decision in this case is applicable to both divisions of King County, and we take this opportunity to resolve the conflict.

Guided by our independent state law analysis, we hold that King County's administrative booking process violates article I, section 7 because it intrudes on out-of-custody pretrial defendants' "'private affairs,'" and the State fails to satisfy its burden in showing that it is performed with the necessary "'authority of law'" to justify the intrusion. *Blomstrom v. Tripp*, 189 Wn.2d 379, 402, 403, 402 P.3d 831 (2017) (quoting *State v. Surge*, 160 Wn.2d 65, 71, 156 P.3d 208 (2007) (plurality opinion)). Therefore, we affirm the trial court's order in Evans' case and remand for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

A. Evans' charging and arraignment

In January 2024, the King County prosecuting attorney charged Kyle Evans by way of information with the crime of felony possession of a stolen vehicle. The State did not seek a warrant for Evans' arrest. Instead, the State requested and

secured an order issuing a summons for Evans to appear for his arraignment. *See* CrR 2.2(b). Evans was *not* arrested or booked on this charge in a King County jail.

Evans complied with the summons and appeared for his scheduled arraignment hearing where he pleaded not guilty and, at the State's request, he was "ordered to remain in the community on his personal recognizance," subject to certain conditions. Clerk's Papers (CP) at 138, 12-13.[1]

The trial court and the parties in this case use the term "pretrial releasee" to refer to defendants, like Evans, who are allowed to remain in the community pending trial.[2] By contrast, a "pretrial detainee[]" is a defendant being held in "[p]hysical custody by the State" pending trial. *Blomstrom*, 189 Wn.2d at 409.

All adult felony defendants are subject to statutes that require the State to collect their fingerprints, photographs, and other identifying information. *See* RCW 10.98.050; RCW 43.43.735. Ordinarily, this information is collected when a defendant is "lawfully arrested" on "a felony or gross misdemeanor" charge. RCW 43.43.735(1). If, however, a felony defendant has not yet been fingerprinted at the time of arraignment, the trial court must order local authorities to collect this

---

[1] Evans' "conditions of release" instructed that he have "[n]o new law violations; keep address updated with the court; appear at all future court hearings pursuant to CrR 3.4; maintain contact with counsel; abide by all no contact orders" and "no possession or consumption of any controlled substance [or] non-prescribed drugs." CP at 12 (formatting omitted); 1 Verbatim Rep. of Proc. (Jan. 22, 2024) at 2.

[2] For purposes of this case, pretrial releasees "include[ ] those who have been released by a judge on [their] personal recognizance, have been ordered by a judge to participate in a pre-trial monitoring program, or have been ordered to post bail and have done so." CP at 137.

information. RCW 10.98.050(2). In King County, the parties and the trial court use the term "administrative booking" to describe the "collection of fingerprints, photographs, and demographic information" taken from pretrial releasees. CP at 140.

According to the State, administrative booking is relatively rare, as compared to in-custody booking following an arrest; only about 450 to 500 administrative bookings occur per year in King County. Evans does not challenge the constitutionality of the administrative booking statute, RCW 10.98.050(2), or the scope of information to be collected.[3]

B.     The "administrative booking" procedure

The administrative booking statute, RCW 10.98.050(2), does not instruct how a defendant's fingerprints and other information are to be collected and "is silent as to when and where administrative booking must occur." CP at 138. Some counties, including King and Snohomish, use a machine called a "Livescan device" for the administrative booking to "digitally record fingerprints, palm prints, and booking photographs," as well as additional data regarding the defendant and their case, which are then aggregated and transmitted to law enforcement agencies. *Id.*

---

[3] Although Evans does not challenge the underlying statute, there are unanswered questions as to whether the practice of securing fingerprints, through the use of enhanced technology, of persons only accused of crimes but not in custody comports with article I, section 7. Because such a claim has not been brought in this case, we will not opine on its constitutional validity.

In Snohomish County, the Livescan device is placed in the lobby area of the Snohomish County Jail, which is publicly accessible after going through standard courthouse security screening.[4]  By contrast, King County has three Livescan devices.  One device is located on the first floor of the King County Courthouse, but King County does not use this device for its administrative booking.  Instead, King County performs all administrative bookings using the Livescan devices placed in "the secure perimeter of [its two] jails" in Seattle and Kent.  CP at 84.

All individuals entering the Kent jail must go through standard courthouse security screening by emptying their pockets, walking through a magnetometer (metal detector), putting their personal items through an X-ray scanner, and surrendering all weapons.  However, since King County has placed its Livescan devices within the secure perimeter of its jail facilities, a defendant who needs to be administratively booked in either Seattle or Kent must physically enter the jail, subjecting them to additional security measures.

King County has conducted its administrative bookings inside of its jails for over 20 years.  However, King County does not have an official governing policy for administrative bookings, and the statute does not instruct that defendants must be administratively booked the same day as their arraignment.  RCW 10.98.050(2).

---

[4] Photographs of the Livescan device on location in Snohomish County were provided in the record.  See CP at 244-50.  However, the record does not contain any photographs of King County's Livescan devices or where they are located within its jail facilities.

Nevertheless, King County prosecutors routinely request a defendant remain in the courtroom after arraignment, so they can be taken to the jail for administrative booking that same day. This process involves requiring a defendant be "pat searched for drugs and weapons" and "placed in handcuffs" for 5 to 10 minutes while they are "escorted to the booking area" inside the jail. CP at 140. A defendant is "typically detained at the booking area for a period ranging from 30 minutes to two hours," and they "may be secured in a cell [without handcuffs] . . . until sufficient staff are available" to complete the administrative booking using the Livescan device. *Id.* Thus, this process of being booked *administratively* for fingerprinting is very similar to the process of being booked *into jail custody*.[5]

C.      King County superior court judges have reached different conclusions as to the constitutionality of the administrative booking process

Evans is not the only person to challenge King County's administrative booking process, and superior court judges from both Seattle and Kent have reached different conclusions as to the constitutionality of the process.

In Evans' case, Kent-based King County Superior Court Judge Johanna Bender ruled that the State's proposed administrative booking process that requires

---

[5] According to the intake, transfer and release captain for King County Department of Adult and Juvenile Detention, pretrial releasees "are processed similarly" to pretrial detainees. CP at 64. However, unlike a person being booked into jail custody, a pretrial releasee does "not have to dress out of their clothes," submit to a body scan search, or have their property inventoried. *Id.*

searching and seizing his personal belongings, the use of handcuffs for his transport, and detaining him in a jail is an intrusion on his private affairs and performed without authority of law, contrary to article I, section 7. CP at 145-47. Judge Bender also ruled that the State may take Evans' fingerprints, but it "may not handcuff [him], take possession of his personal belongings, or detain him in a cell" during the process. *Id.* at 137. Moreover, Judge Bender previously issued a similar order in another case, *State v. Harris*, No. 20-1-06730-6 KNT (King County Super. Ct., Wash. filed Jan. 7, 2024), which the State did not appeal. These orders remain in effect at the MRJC in Kent.

By contrast, Seattle-based King County Superior Court Judge Melinda Young considered a similar motion in a different case, *State v. Tyas*, No. 23-1-04744-0 SEA (King County Super. Ct., Wash. filed Mar. 29, 2024), and ruled in favor of the State. *See* Mot. for Discr. Rev., App. B. Judge Young determined that article I, section 7 does not provide independent state law protections for pretrial releasees and ruled that King County's chosen method for administrative bookings complies with the Fourth Amendment to the federal constitution. *See* U.S. CONST. amend. IV.

Given the conflicting orders in King County and the parties' stipulation, the trial court in Evans' case certified its order for review. Our commissioner granted review, and we accepted the amicus brief from the American Civil Liberties Union

of Washington (ACLU). Additionally, the parties' joint status update confirmed that Evans has been administratively booked. Joint Status Rep., *State v. Evans*, No. 103136-0 (Wash. Apr. 8, 2025), at 4. However, administrative bookings are still not occurring at the MRJC in Kent, except "in limited circumstances" where a defendant agrees to it to take advantage of a plea offer. *Id.* at 3.

## ISSUE

Does King County's administrative booking process violate article I, section 7?

## ANALYSIS

A.    Article I, section 7 claims are analyzed as a matter of independent state law

We initially adopted the *Gunwall* factors to determine "whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution." *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986). In recent years, we have continued to "reaffirm that no *Gunwall* analysis" is necessary for "[c]ourts and parties [to] assume an independent state analysis is justified and move directly to the merits of the article I, section 7 claim presented." *State v. Mayfield*, 192 Wn.2d 871, 879, 434 P.3d 58 (2019).[6]

---

[6] *See also State v. Sum*, 199 Wn.2d 627, 636 n.2, 511 P.3d 92 (2022); *State v. Eserjose*, 171 Wn.2d 907, 259 P.3d 172 (2011) (plurality opinion); *State v. Chenoweth*, 160 Wn.2d 454, 462-63, 158 P.3d 595 (2007); *State v. Afana*, 169 Wn.2d 169, 179-84, 233 P.3d 879 (2010); *State*

In this instance, the State argues that we should conduct a *Gunwall* analysis and hold that "article I, section 7 and the Fourth Amendment are coextensive in this context." Pet'r's Opening Br. at 15 (some capitalization omitted). However, the State does not ask us to disavow our controlling precedent, nor does it conduct the necessary analysis to do so. Instead, the State largely focuses on its disagreements with the trial court's *Gunwall* analysis.

We take this opportunity now to explain that a *Gunwall* analysis is not always necessary; rather, it is intended to be relied on as a focusing tool and not as a keyhole to reach an independent state law constitutional issue. Further, we decline to accept the State's attempt to repurpose *Gunwall* as a restriction on the independent meaning of our state constitution. To the extent the State's *Gunwall* arguments are relevant to Evans' article I, section 7 claim, we address them below.

B.      An administrative booking process that requires patting down, handcuffing, and detaining a pretrial releasee to take their fingerprints and identifying information violates article I, section 7

Article I, section 7 of the Washington Constitution guarantees that "[n]o person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." Constitutional issues are questions of law that we review de novo. *State v. Cornwell*, 190 Wn.2d 296, 300, 412 P.3d 1265 (2018).

---

v. Winterstein, 167 Wn.2d 620, 631-36, 220 P.3d 1226 (2009); *State v. Gaines*, 154 Wn.2d 711, 717-22, 116 P.3d 993 (2005).

9

We evaluate article I, section 7 claims by engaging in a two-step analysis: "First, we determine 'whether the action complained of constitutes a disturbance of one's private affairs.' . . . Second, we consider 'whether authority of law justifies the intrusion.'" *Blomstrom*, 189 Wn.2d at 402-03 (quoting *Surge*, 160 Wn.2d at 71). Here, Evans bears "the burden of proving a disturbance of his private affairs." *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998). If Evans meets his burden, "then the burden shifts to the State" to show the disturbance is justified by authority of law. *State v. Sum*, 199 Wn.2d 627, 654, 511 P.3d 92 (2022).

Because many pretrial releasees are not subject to community conditions that would allow the State the right to engage in warrantless searches and seizures while they are living in the community awaiting trial, we hold that pretrial releasees, who are released on their own personal recognizance, suffer no diminished right to privacy simply because they have been accused of a crime.[7] Thus, we hold that King County's administrative booking process is an intrusion

---

[7] Although not at issue in this case, our opinion does not affect a trial court's authority to impose pretrial release conditions in accordance with CrR 3.2. Here, the trial court continued Evans' administrative booking to address his objections to King County's proposed administrative booking process. CP at 15. Nevertheless, in a separate order, the trial court released Evans on his personal recognizance and imposed pretrial release conditions, which are not challenged on review in this court. *Id.* at 12. The conditions of Evans' release do not require him to submit to warrantless searches and seizures or otherwise affect his ability to freely move about. However, each case presents different circumstances that must be considered in determining the appropriate conditions for a defendant's release pending trial.

on the private affairs of pretrial releasees, and the State fails to meet its burden in showing the disturbance is justified by authority of law.

  1. The administrative booking process in King County disturbs the private affairs of pretrial releasees

Article I, section 7's "private affairs inquiry focuses on those privacy interests that Washington citizens have held and should be entitled to hold safe from governmental trespass absent a warrant." *State v. Puapuaga*, 164 Wn.2d 515, 522, 192 P.3d 360 (2008). When conducting this inquiry, we must "determine 'whether the unique characteristics of the state constitutional provision and its prior interpretations actually compel a particular result'" based on "'the constitutional text,'" history, and "'the current implications of recognizing or not recognizing an interest.'" *Sum*, 199 Wn.2d at 639 (internal quotation marks omitted) (quoting *Mayfield*, 192 Wn.2d at 879-80).

As previously discussed, King County's administrative booking process that requires a pat-down search is "invasive enough to look for 'small quantities of drugs.'" CP at 140. The administrative booking process then requires that the defendant is handcuffed for 5 to 10 minutes, escorted into the jail, and detained in the booking area (sometimes in a jail cell) for up to 2 hours while they wait for staff to complete the administrative booking. It is undisputed that these actions (patting down, handcuffing, and detaining) "constitute seizures and searches that would disturb the affairs of ordinary citizens not charged with crimes." Pet'r's

Reply Br. at 3 n.2. The question is whether these same actions disturb the private affairs of a pretrial releasee living in the community awaiting trial.

Our analysis begins with "the historical treatment of the interest asserted," but history does not provide a clear answer in this case. *Puapuaga*, 164 Wn.2d at 522. To the contrary, the privacy interests of pretrial releasees have not been "clearly defined" in Washington or other jurisdictions. *Blomstrom*, 189 Wn.2d at 409. Therefore, we must "ask whether the expectation is one that a citizen of this state is entitled to hold," which requires looking at "the nature and extent" of the intrusion "and the extent to which the information has been voluntarily exposed to the public." *Puapuaga*, 164 Wn.2d at 522.

When considering the nature and extent of the intrusion, it is important to reiterate that the relevant "intrusion" is *not* the taking of fingerprints and other identifying information. Instead, it is the intrusions that result from an administrative booking process that requires patting down, handcuffing, and detaining a pretrial releasee. We recognize that the nature and extent of this intrusion is significant.

This court has previously held that "pat-down searches" are "'highly intensive'" intrusions on private affairs. *Blomstrom*, 189 Wn.2d at 404 (quoting *Jacobsen v. City of Seattle*, 98 Wn.2d 668, 674, 658 P.2d 653 (1983)). It is undisputed that King County's administrative booking process requires the

defendant to be handcuffed for 5 to 10 minutes and then detained (possibly in a jail cell) for up to 2 hours. The State characterizes this lengthy seizure as "minimally intrusive," but it cites no authority to support this assertion, and common sense indicates otherwise. Pet'r's Opening Br. at 2. Therefore, we recognize that *in general*, an administrative booking process that requires patting someone down, placing them in handcuffs, and detaining them for up to 2 hours in a jail facility is a significant intrusion that is akin to an arrest.

Our private affairs inquiry must account for any intrusions Evans is already subject to because "a person's privacy rights under article I, section 7 may vary based on that person's status." *Surge*, 160 Wn.2d at 74; *see also Puapuaga*, 164 Wn.2d at 523; *State v. Cheatam*, 150 Wn.2d 626, 642, 81 P.3d 830 (2003). For example, taking Evans' fingerprints in the administrative booking process is not an intrusion because, as a person charged with a felony, he is *already* required by statute to have his fingerprints taken. Similarly, asking Evans to walk through a metal detector or empty his pockets would not be an intrusion, as he was required to do so when going through general security screening to enter the courthouse.

However, according to the State, because Evans *could have been* arrested, searched, handcuffed, and detained pending trial, his situation is the same as someone who *actually has been* arrested, searched, handcuffed, and detained pending trial. In other words, the State argues that the privacy rights of a pretrial

13

releasee and a pretrial detainee are indistinguishable for purposes of article I, section 7. The State's argument is incorrect, and we expressly reject this view.

Although the privacy rights of pretrial releasees have not been clearly defined, our case law requires consideration of the specific situation presented, with an emphasis on physical custody. For example, we have recognized that "'once the accused is lawfully *arrested and is in custody*, the effects in [their] possession . . . may lawfully be searched and seized without a warrant'" in "a valid inventory search." *Cheatam*, 150 Wn.2d at 635 (emphasis added) (quoting *United States v. Edwards*, 415 U.S. 800, 807, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974)), 642. Likewise, a pretrial detainee "*in custody*" does not have "a protectable privacy interest in property properly inventoried, seized, and held by state officials." *Puapuaga*, 164 Wn.2d at 523 (emphasis added), 524.

However, "the privacy interests of detainees and releasees appear to differ to the extent required by the adjudicative process." *Blomstrom*, 189 Wn.2d at 409. A person in custody may be lawfully searched and seized "'because these intrusions are necessary for the system to work.'" *Id.* at 409-10 (quoting Sandra G. Mayson, *Dangerous Defendants*, 127 YALE L.J. 490, 533 (2018)). Moreover, we have repeatedly emphasized that *custody* is the key to such intrusions; a detainee's property must be inventoried "for safekeeping," and the detainee must be searched to prevent the introduction of drugs or contraband into a secure setting. *Cheatam*,

150 Wn.2d at 642.  Thus, the fact that an individual is held in a custodial setting under the direct supervision of law enforcement necessitates a lowered expectation of privacy.

Nevertheless, the State argues that custody is not particularly important, or even relevant, to the private affairs inquiry.  Instead, the State asserts that the same limitations on privacy are implicated every time "probable cause exists to believe a person committed a felony offense," regardless of whether the person is arrested or taken into custody.  Pet'r's Opening Br. at 21.  The State cites no Washington law supporting this view, and we reject it as a matter of independent state law.

We have rejected attempts to limit the protections of article I, section 7 based on lawful actions the State *could have*, but *did not* take.  For example, in *State v. Winterstein*, we considered the federal "inevitable discovery doctrine" and observed that "[t]he State seeks to admit evidence that it claims the police would have discovered notwithstanding the violation of the defendant's constitutional rights."  167 Wn.2d 620, 634, 220 P.3d 1226 (2009).  We rejected this doctrine as "necessarily speculative," requiring a determination of what "'would have been discovered by lawful means,'" if lawful means had hypothetically been employed. *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)).

15

Similarly, the State asks us to hold that the privacy interests of pretrial releasees are the same as pretrial detainees because, hypothetically, every releasee *could have been* arrested and booked into custody. As in *Winterstein*, we reject this "necessarily speculative" argument and hold that pretrial releasees do not suffer any "diminution of their privacy rights," except to "the extent *required* by the adjudicative process." *Id.*; *Blomstrom*, 189 Wn.2d at 410, 409 (emphasis added). Simply put, where a person is *not* taken into custody, the adjudicative process does *not* require patting them down, handcuffing them, and detaining them. Evans has shown an intrusion on his private affairs, and the State has the burden to show authority of law justifying the intrusion.

      2.     The administrative booking process in King County is not supported by authority of law

Generally, authority of law "may be satisfied by a valid warrant, a recognized exception to the warrant requirement, a constitutional statute, or a court rule." *Blomstrom*, 189 Wn.2d at 404 (footnote omitted). In addition, we held in *Olsen* that a probation condition in a judgment and sentence "constitutes sufficient 'authority of law'" if it is "narrowly tailored" to serve "a compelling interest." *State v. Olsen*, 189 Wn.2d 118, 126, 399 P.3d 1141 (2017). In Evans' case, the State did not obtain a warrant and the State does not argue that a court rule applies. Instead, the State claims its authority of law is derived from exceptions to the warrant requirement, RCW 10.98.050, and *Olsen*'s balancing test. However, there

16

are no applicable warrant exceptions, and neither the statute nor *Olsen* justifies the

intrusions.

        a.      The State's asserted exceptions to the warrant requirement do
not provide the authority of law to permit King County's
administrative booking process

The State asserts several exceptions to the warrant requirement, but none are

applicable.  First, the State emphasizes the fact that any person *could be* subject to

"an arrest or search incident to arrest" on "a determination of probable cause."

Pet'r's Reply Br. at 4.  Thus, in the State's view, the administrative booking

process is "authorized by law in the same way that an arrest or search incident to

arrest is authorized."  *Id.*  However, as discussed, Evans was never arrested and

booked for the charged offense; that is precisely why he needed administrative

booking.  Contrary to the State's view, the warrant exceptions applicable to arrests

do not apply to the facts presented here.  To the extent the State seeks to extend

these exceptions to apply in cases where an arrest *could have* occurred, we reject

this speculative argument.  *Cf. Winterstein*, 167 Wn.2d at 634.

In addition, the State asserts exceptions to the federal warrant requirement,

including "'special needs'" and "'administrative searches.'"  Pet'r's Opening Br. at

38-39 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed.

2d 709 (1987); *United States v. Bulacan*, 156 F.3d 963, 968 (9th Cir. 1998)).

However, we have repeatedly declined to adopt "'a general special needs

exception,'" and the State does not show that we should adopt the federal exception for administrative searches as a matter of independent state law. *State v. Meredith*, 1 Wn.3d 262, 282, 525 P.3d 584 (2023) (plurality opinion) (quoting *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 314, 178 P.3d 995 (2008)). Thus, the State does not meet its burden to show authority of law with any of its asserted exceptions to the warrant requirement.

> b. RCW 10.98.050 does not provide the authority of law to permit King County's administrative booking process

Secondly, the State asserts that RCW 10.98.050(2) authorizes King County's chosen method in requiring the patting down, handcuffing, and detaining of pretrial releasees for administrative booking. However, the statute does not expressly authorize any intrusion beyond the collection of a defendant's fingerprints and other identifying information. Despite the statute's plain language, the State asserts that King County has chosen to conduct all administrative bookings inside of its jails, and individuals entering the jail must be subject to additional security measures.

Unquestionably, a person entering the secure perimeter of a jail is properly subject to security measures to prevent the introduction of contraband and to protect the safety of jail staff and other inmates. Still, RCW 10.98.050(2) neither requires nor authorizes administrative bookings to occur in a jail. While the State argues that "the legislature understood and intended that a local corrections agency

18

would conduct administrative bookings" within its jail facilities, we decline to assume our legislature intended to diminish constitutional privacy rights by implication, in a statute that "is admittedly silent" on the issue. Pet'r's Reply Br. at 4, 3. Thus, we hold that RCW 10.98.050(2) does not provide authority of law for King County's administrative booking process.

      c.      The *Olsen* balancing test does not provide the authority of law to permit King County's administrative booking process

Finally, the State argues that "[t]he *Olsen* balancing test should be applied here." Pet'r's Opening Br. at 32. As discussed, *Olsen* held that a probation condition in a judgment and sentence can provide authority of law if "a compelling interest, achieved through narrowly tailored means, supports the intrusion." 189 Wn.2d at 128. We adopted this balancing test because "[p]robationers have a reduced expectation of privacy," as they have been convicted and "'sentenced to confinement but . . . are serving their time outside the prison walls.'" *Id.* at 124-25 (quoting *State v. Jardinez*, 184 Wn. App. 518, 523, 338 P.3d 292 (2014)); *see also State v. Nelson*, 4 Wn.3d 482, 565 P.3d 906 (2025) (applying *Olsen* to community custody conditions). However, we have not applied *Olsen*'s balancing test to "defendants charged but not yet convicted," as the State now asks us to do. *Blomstrom*, 189 Wn.2d at 408. Indeed, we have observed that "there is a world of difference between someone who has been released under probation conditions, as

19

was the case in *Olsen*, and someone who has merely been arrested." *State v. Villela*, 194 Wn.2d 451, 461 n.4, 450 P.3d 170 (2019).

The State highlights several reasons to extend *Olsen* to this context. The State notes that King County's administrative booking process that requires patting down, handcuffing, and detaining pretrial releasees "is not done for law enforcement purposes" or to investigate evidence of a crime; it is done to ensure safety within the jail's secure perimeter while the releasee is fingerprinted. Pet'r's Opening Br. at 34-35. Moreover, the State emphasizes the fact that a pretrial releasee is, by definition, someone "against whom charges have been leveled and there has been a probable cause finding." *Id.* at 35. These are valid points; nevertheless, we decline to decide that *Olsen* applies in this context, and, even if we were to extend the *Olsen* balancing test to this context, it is not satisfied here.

It is undisputed that the administrative booking statute, RCW 10.98.050(2), authorizes a limited intrusion to collect a defendant's fingerprints and other identifying information. However, an otherwise-authorized intrusion "could potentially lack 'authority of law'" if it is carried out "in an unreasonable manner." *Olsen*, 189 Wn.2d at 134. Thus, to meet its burden, the State must show that an administrative booking process that requires patting down, handcuffing, and detaining a pretrial releasee in jail is "narrowly tailored" to support a "compelling interest." *Id.* at 128.

We assume, without deciding, that the State's interest in its collection of fingerprints and other identifying information from pretrial defendants "in a secure, reliable manner for the proper administration of the [Sentencing Reform Act of 1981, ch. 9.94A RCW], for identifying and tracking felons, and for collecting data for statewide planning and forecasting of the felon population" is compelling. Pet'r's Opening Br. at 14. However, the State asserts other interests that are *not* compelling, and we do not factor them into our analysis.

The State notes that "administrative booking has been conducted inside secure areas of its two jail facilities, for decades without complaint." *Id.* at 1. However, the State does not have a legitimate interest, much less a compelling one, in maintaining an unconstitutional practice based solely on its longevity. *Cf. State v. Jackson*, 195 Wn.2d 841, 850-51, 467 P.3d 97 (2020) (discussing the long history of unconstitutional shackling).

Additionally, the State emphasizes that "[m]oving the [administrative booking] process to a location outside of the jail would duplicate costs and complexities" due to staffing and security requirements for Livescan machines.[8]

---

[8] We take judicial notice of the fact that King County voters recently approved a property tax increase specifically to fund and maintain the county's Livescan devices, indicating these financial constraints can be addressed without violating article I, section 7. *See* April 2025 Special Election, Election Results, https://cdn.kingcounty.gov/-/media/king-county/depts/elections/results/2025/04/results-final.pdf?rev=13bee1e1120a4426af191f09baef39aa&hash=0EBB0B4232D58160C51C6365154A75B9.

Pet'r's Opening Br. at 13. Yet, as the trial court observed, "the government is routinely inconvenienced" by the requirements of article I, section 7. CP at 147. For example, roadblocks and warrantless blood draws are "simpler, more efficient, [and] less expensive" than obtaining warrants, but they are also flatly unconstitutional. *Id.* (citing *City of Seattle v. Mesiani*, 110 Wn.2d 454, 755 P.2d 775 (1988); *City of Seattle v. Pearson*, 192 Wn. App. 802, 369 P.3d 194 (2016)).

Thus, the State's only compelling interest is the secure, reliable collection of fingerprints and other identifying information in accordance with the administrative booking statute, RCW 10.98.050(2). Although compelling, *Olsen* still requires the State to prove that its administrative booking process, as applied to pretrial releasees, is "narrowly tailored" to achieve this interest. 189 Wn.2d at 128.

Narrow tailoring is shown "when the State 'has selected the less drastic means for effectuating its objectives.'" *Blomstrom*, 189 Wn.2d at 404 n.22 (internal quotation marks omitted) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973)). The State fails to demonstrate narrow tailoring when "there are less invasive means of achieving the same ends." *Id.*

According to the State, "the only available Livescan device is inside the jail;" thus, there is *no way* for King County to administratively book pretrial

releasees without taking them inside the secure perimeter of the jail and requiring additional security measures. Pet'r's Opening Br. at 13. However, counsel for the State acknowledged at oral argument that it is "certainly possible" to move the process outside of the jail but it is a matter of convenience and resources. Wash. Sup. Ct. oral arg., *State v. Evans*, No. 103136-0 (May 15, 2025), at 45 min., 55 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org/video/washington-state-supreme-court-2025051116/?eventID=2025051116. Further, the trial court found, and the State does not dispute, that "[t]here is an additional Livescan device located on the first floor of the King County Courthouse," outside the jail's secure perimeter. CP at 138. Simply put, King County already has a Livescan device outside the jail; it has chosen to conduct its administrative bookings using the Livescan devices inside its jails.

Similar to the Livescan device used by Snohomish County, the Livescan device on the first floor of King County's Seattle courthouse does not appear to require patting down, handcuffing, and detaining everyone who needs to use it. This strongly indicates there are "less invasive means" of achieving the State's compelling interests in collecting fingerprints and identifying information from pretrial releasees. *Blomstrom*, 189 Wn.2d at 404 n.22. The State argues that it cannot easily move the administrative booking process to its first-floor Livescan

device and that doing so would be costly and require logistical work-arounds. However, as discussed above, that does not excuse compliance with article I, section 7.

The State also argues that it must protect "the 'chain-of-custody' of the defendant," so as "to ensure that the person answering charges in court is the same person who is 'booked.'" Pet'r's Opening Br. at 13, 5. According to the State, this means the defendant cannot simply be ordered to return for administrative booking at a specified time and place, and instead must be escorted directly from the courtroom to the administrative booking area. However, the State does not provide evidence to justify this concern beyond a vague statement that King County has had situations "where individuals have attempted to use [photo identification] of people who looked similar." CP at 85. Moreover, the State's chain-of-custody argument fails to account for the reality of pretrial releasees.

In Evans' case, he was not arrested and brought to the courthouse by law enforcement. Instead, the trial court issued a summons, and a man claiming to be Kyle Evans appeared for his arraignment. The State does not explain why the man who appeared for arraignment is more likely to be Kyle Evans than the man who will appear for administrative booking. Additionally, the State's argument overlooks the fact that "defendants who are arraigned via Zoom are not taken immediately to the jail. They are told to report to the jail at a specified time for

24

administrative booking." Mot. for Discr. Rev., App. B at 1 n.1. The State does not explain why this process is sufficiently secure for Zoom arraignments, but not for in-person arraignments.

Thus, while it is certainly true that an administrative booking process that requires patting down, handcuffing, and detaining a person entering the jail is necessary for security reasons, it is also irrelevant. The State does not show that administrative booking actually requires pretrial releasees to enter the jail in the first place. Therefore, King County's administrative booking process is not narrowly tailored and cannot survive the *Olsen* balancing test.

CONCLUSION

We affirm the trial court's order in Evans' case and hold that King County's administrative booking process violates article I, section 7. This case is remanded back to the trial court for further proceedings consistent with this opinion.


Yu, J.

WE CONCUR:

Stephens, C.J.

Gordon McCloud, J.

Johnson, J.

Whitener, J.

Madsen, J.

Mungia, J.

González, J.

Feldman, J.P.T.